FOX, P. J.
 

 Defendant was convicted of violating section 11500 of the Health and Safety Code, possession of heroin. He appeals from the judgment of conviction and from the order denying his motion for a new trial.
 

 Defendant does not challenge the sufficiency of the evidence to sustain the judgment of conviction. His position is that there was no reasonable or probable cause for his arrest and the search of his person and house apart from certain information furnished by an informant whose identity the police declined to reveal. It is therefore necessary to state in considerable detail the circumstances leading up to defendant’s arrest.
 

 Officer Fesler, of the Los Angeles Police Department assigned to the Narcotics Division, began an investigation of defendant on May 7, 1958. He interviewed three narcotic users whom he had picked up in the vicinity of 5th Street and Central Avenue, and inquired of them as to who was the biggest peddler in that area. Two of them indicated he was a man known as “Big Sam.” They informed Officer Fesler that he ran an auto wash rack near 6th and Central. One stated that he believed Big Sam secured his narcotics from “a large Mexican” and that this Mexican drove a Buielt. The officer obtained a description of Big Sam from two of these men.
 

 
 *48
 
 On May 19, Fesler and Sergeant Stevenson staked out in the vicinity of 6th and Central. Fesler saw a man who answered the description of Big Sam enter a car and drive away. In the back seat was a person whom the officer recognized as a narcotic user.
 

 On May 24, 1958, Fesler and Sergeant Burkland picked up a man named Charlie Bowers, and his wife. Bowers indicated several locations where narcotics were being sold, one of them being at a wash rack at 6th and Central by a “Big Sam.” He thought Sam’s connection was a large male Mexican who drove a Buick. Bowers described Big Sam’s method of operation for the police. He stated that Sam carried no narcotics on his person but hid it up the alley in back of the wash rack, and at other places in the immediate vicinity.
 

 On May 29th Fesler again placed the wash rack under observation. He saw several persons known to him as narcotic users go to the car in which defendant was seated, where there would be some conversation. On one or two occasions Big Sam would leave the car and walk up the alley with the other person. The officer also staked out this location on June 6th and 13th. On each occasion he saw narcotic users in conversation with defendant. The officer spoke to two of them on the 6th, and three of them on the 13th. He remembered only the name of Robert Patterson, who was a user. Patterson told the officers that Big Sam was dealing in narcotics but that he had not purchased any from him. About this time, the officer also interviewed Rudolph Johnson and George Gibson, two narcotic users he saw in the vicinity of the wash rack; both informed the officer that Big Sam was dealing in narcotics but neither admitted that he had purchased any narcotics from him. A day or so later, Fesler interviewed three men in Central Jail, two of whom he recognized as men he had seen at the wash rack; he was not able, however, to recall their names. They admitted having been at that location. They also reported that Big Sam was dealing in narcotics but denied that they had purchased any from him.
 

 On July 22, Fesler instructed Officer Keefer to ascertain the name of the man known as Big Sam. He went to the wash rack on the pretext of having his private car washed. He conversed with Big Sam and learned that his name was Samuel Lee Taylor.
 

 Fesler then went to the Police Building and checked the records of Samuel Lee Taylor and found a picture of him; he also found that Taylor had had three narcotic arrests plus
 
 *49
 
 burglary and robbery. It was hard to tell from the record, but Fesler concluded that Taylor had been convicted of narcotic addiction.
 

 The next day Fesler went back to the wash rack. He observed a maroon Buick, in which was seated a large male Mexican who was engaged in conversation with Taylor. A few minutes later Taylor left the Mexican and walked up the alley to 5th Street where he met a man named Joe Hayes, who was known to Fesler as a dope peddler. Fesler returned to the Police Building and told his superior officers that he thought a transaction was about to be made at the wash rack. The officers went back to a lot across the street from the wash rack. Taylor soon returned, spoke briefly to the Mexican, entered his car, and left. A check was made on the maroon Buick, which disclosed that it belonged to one Pete Amador who lived in Aliso Village. Investigation of his record revealed that he had been arrested for violation of the federal narcotics act. His photograph showed that he was the same person that the officer had seen in conversation with Taylor.
 

 Fesler observed Taylor in conversation with Alex Waters on the 29th and 30th. The officer later interviewed Waters and found him to be a narcotic user.
 

 Shortly after Fesler identified Pete Amador, in the latter part of July, Officer Leeds inquired of Fesler whether he was acquainted with a man known as Big Sam. Leeds reported that he had heard of a man known as Big Sam who was dealing in large quantities of heroin. Fesler determined that their information had come from separate sources. Soon after this, Leeds advised Fesler that when Big Sam made delivery he went to the 800-900 block of West 50th Street, between Hoover and Vermont; that the person to whom he was to make a delivery would wait in his ear, and that Sam would walk to the middle of the block. Leeds also told Fesler that he had made a cheek of Sam’s record and had discovered that he formerly lived in that area on West 50th Street; that he had observed Sam in that vicinity.
 

 At about noon on August 8th, Fesler and his partner placed under observation the block on West 50th Street between Hoover and Vermont. Soon thereafter they observed Taylor park in the center of the block, cross the street, and enter a house in the rear. Investigation disclosed that this house was in the rear of 852 West 50th Street. Fesler then called Leeds, who was standing by in the office, and told him that ‘ ‘ Sam had
 
 *50
 
 been to the spot and put down his stash.” Fesler testified: “I planned to make the arrest the next time I saw him leave that house on foot.” At approximately 5 o’clock Taylor was out on the street. Officer Fesler approached him on foot on the sidewalk while three other officers approached in a car. Defendant was placed under arrest. In the search that followed, Officer MeCarville removed from defendant’s pocket two packages of four bindles each, the contents of which proved to be heroin. Defendant told the police that he had paid $50 for the heroin.
 

 Fesler asked the defendant why he peddled narcotics. He answered that it was because Ms wife and children were all sick. Upon searching the address at 852% West 50th Street, Fesler found paper that resembled the paper in which the bindles were wrapped.
 

 Officer Fesler did not have a warrant when he arrested the defendant.
 

 Defendant did not take the stand in his own behalf. He only called one witness, Officer Leeds, who testified that he had received information from an informant that defendant would have narcotics in his possession at approximately 4 p. m., at 50th and Vermont. This information was furnished to Fesler. Leeds declined to reveal the name of his informant “because it would be detrimental to his health.” Asked whether the reason the arrest was made at the particular time and place was because of the information from his informant, Leeds answered that as far as he was concerned that was the main reason though he had other information also. Officer Fesler testified that he and his partner had staked out the West 50th Street location before Officer Leeds advised him of his information regarding defendant’s possession of narcotics.
 

 “Probable cause is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused.”
 
 (Bompensiero
 
 v.
 
 Superior Court,
 
 44 Cal.2d 178, 183 [281 P.2d 250].) Applying this test, the trial judge came to the conclusion that, excluding the information furnished Officer Leeds to the effect that defendant would have “stuff” later that afternoon, the officers had probable cause to arrest the defendant. Relying on the proposition that “disclosure has not been required where there was reasonable cause for a search and seizure apart from informant’s communication which led the police to suspect the defendant”
 
 (People
 
 v.
 
 Williams,
 
 51 Cal.2d 355, 359 [333 P.2d 19]), the trial court
 
 *51
 
 refused to require Officer Leeds to disclose the name of his informant and permitted the contraband found on defendant’s person to be received in evidence. In this connection it should be pointed out that the weight to be accorded the information upon which the arresting officers acted in making the arrest was essentially for the trial court’s determination in the exercise of a sound discretion.
 
 (Lorenzen
 
 v.
 
 Superior Court,
 
 150 Cal.App.2d 506, 510 [310 P.2d 180] ;
 
 People
 
 v.
 
 Gonzales,
 
 141 Cal.App.2d 604, 607 [297 P.2d 50] ;
 
 People
 
 v.
 
 Arter,
 
 169 Cal.App.2d 439, 443 [337 P.2d 534].)
 

 The record, we believe, adequately supports the position of the trial court. The wash rack and defendant’s activities were under surveillance for some three months. Inquiry of narcotic users by the police as to who was the biggest peddler in that area uniformly brought the same answer—Big Sam. This information came not from a single source but from numerous individuals, separately. One may with reason discount a story brought to him by a single individual. He may continue to view the story with suspicion when a second person relates it to him. But when he gets the same information from a number of independent sources— that a certain man is selling narcotics—he is entitled to attach some degree of reliability to it. It may be that the story is untrue. But it is also possible that a so-called reliable informant is not telling the truth, or that his information is incorrect. The police were not confined, however, to the uncorroborated reports of informants, many of whose names were mentioned during the trial. The police investigation disclosed that defendant had an extensive criminal record, much of it in narcotics. The police were entitled to take this into account for, as stated in
 
 People
 
 v.
 
 Wickliff,
 
 144 Cal.App.2d 207, 212 [300 P.2d 749], “ [i]n determining whether there is reasonable cause ... a peace officer may take into account the past conduct, character and reputation of the person suspected. ...” The surveillance of defendant found him in constant association with known narcotic users. One of his frequent contacts, who was reputed to be his supplier, had been arrested on a federal narcotics charge. These were circumstances the officers were entitled to take into consideration.
 
 (People
 
 v.
 
 Hollins,
 
 173 Cal.App. 2d 88, 93 [343 P.2d 174].) Information furnished the officers cheeked out correctly. Officer Leeds, from entirely different sources, came up with the same information as Officer Fesler—that Big Sam was peddling narcotics. Leeds’
 
 *52
 
 information as to the locality in which defendant lived (or perhaps still lived) proved to be right. Pesler had placed that area under observation and had seen defendant go to a particular house from which he apparently operated, before Leeds relayed the information of defendant’s expected possession. It is a reasonable inference from this factual picture that Pesler contemplated arresting defendant at any time. Of course he wanted to make the arrest at a propitious moment. Having heard of defendant’s method of operation in that area he naturally wanted to see whether a prospective customer drove up and stopped in the middle of the block and made contact with defendant at the curb. In the meantime, Pesler received supplemental information from Leeds that defendant had, or was going to have, his supply. There was no point in waiting for a prospective purchaser to arrive. Since Pesler already had a reasonable basis for making the arrest it could have no bearing on defendant’s constitutional rights whether he made the arrest when he first saw defendant at 852% West 50th Street, or when he (in cooperation with the other officers) actually made the arrest, or whether he had waited for an expected customer to stop at the curb and then made the arrest.
 

 In this connection it should be pointed out that Leeds’ informant was neither a participant nor a material witness to the offense for which defendant was prosecuted, nor does it appear that he would have been able to give any testimony which would be relevant or helpful to the defense of the accused or essential to a fair determination of the cause.
 

 There is no merit in defendant’s suggestion that if he had the name of the informant, possible defenses that he is at present unaware of, such as entrapment, might suggest themselves to him. He presented no claim in the trial court that he was induced into possession. Defendant, who is in the best position to say whether or not he was entrapped^ failed to testify.
 

 The judgment and order are affirmed.
 

 Ashburn, J., and Herndon, J., concurred.