184 Cal.App.2d 308 (1960)
THE PEOPLE, Respondent,
v.
JESSIE PAUL FISHER et al., Defendants; JOHN W. WILKINS, Appellant.
Crim. No. 7169. 
California Court of Appeals. Second Dist., Div. One. 
Sept. 1, 1960.
 John W. Wilkins, in pro. per., for Appellant.
 Stanley Mosk, Attorney General, Doris H. Maier and C. Michael Gianola, Deputy Attorneys General, for Respondent.
 LILLIE, J.
 Defendant Wilkins and two others, Fisher and one Beverly Johns, were charged on Count I with possession of heroin in violation of section 11500, Health and Safety Code; in addition, Wilkins was charged with three prior felony convictions under the same section. Count II accuses only Fisher of possession of marijuana. Defendant and Fisher, having waived their rights to a jury trial, submitted the matter to the court on the testimony contained in the transcript of the proceedings had at the preliminary hearing, and then moved to suppress certain evidence on the ground that it was the result of an illegal search and seizure. Argued extensively by counsel, the motion was denied. Defendant neither took the stand nor offered a defense. The trial court found him guilty as charged and his prior felony convictions, as alleged, to be true and sentenced him to the state prison. This appeal is by Wilkins only.
 The uncontested testimony of the two police officers discloses that all defendants were arrested with narcotics and assorted paraphernalia in their possession. Defendant does not deny this, but argues that there was no reasonable cause for his arrest without a warrant, and thus the evidence, (Exhibits 1A-B-C-D-E--heroin, balloons, a funnel, paper, a strainer, hypodermic needles, eyedroppers and a metal teaspoon taken immediately after his arrest), was illegally seized after an unlawful search, under the rule of People v. Cahan, 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513].
 At approximately 9:30 a. m., as narcotics officers Beckmann, Leeds and Dreese drove past an apartment building on Central Avenue, Beckmann noticed an automobile parked several hundred yards away, which he recognized as belonging to defendant Wilkins. Beckmann had known Wilkins personally for four or five years and knew of his past record and activities concerning narcotics, having arrested him several years before for possession of narcotics, for which he was convicted. The officers parked and went into the apartment house where Beckmann asked the manager concerning the whereabouts of Fisher and Wilkins. He told them that Fisher lived there, the latter having recently moved from apartment 8 to apartment A, and *311 that he was then in the apartment with his cousin. Beckmann asked the manager if Fisher's cousin was, according to his description of Wilkins, a male Negro, thin and tall, about 6 feet 2 inches, with a noticeable limp, and if he drove two cars, a Ford and a Cadillac. The manager answered in the affirmative that the description "sounded as if he was the one who was back in the apartment with Fisher," and that "he had seen this man who had driven these two cars at this address." He also told Beckmann that there was much traffic in and out of apartment A and "that people would come up through the front, the front (sic), and through the back door and that they would give some sort of a secret knock and that they would go inside and that they would be there a short while and then they would leave." Asked by Beckmann for a description of Fisher's apartment and how it was set up, the manager drew a diagram showing apartment A and its layout and floor plan. He told them the apartment was on the second floor to the rear on the northeast side of the building. The officers then located apartment A--Beckmann stationing himself in the back on the outside steps leading to the apartment, and Leeds near the door leading into it from the other side. Beckmann, standing next to it, put his head against the lower part of the open kitchen window. The shade was drawn and he could not see the occupants, but Beckmann could hear male voices coming from the kitchen. He could not hear complete sentences, but heard "snatches of the conversation," certain words and the loud snapping of balloons. At one time he heard a voice say: "(B)e careful of the funnel"; and at another, "(W)here are the balloons; hand me the balloons." Beckmann, who had two years' experience in the Narcotics Division of the police department, was familiar with the parlance, language and items used by persons dealing in and using narcotics, and knew that a "funnel" was used in preparing a powdered narcotics by persons selling, pushing and dealing in narcotics, and that a "balloon," used as a container, is one of the common ways of keeping and selling narcotics. After listening for a short time (from three to five minutes), Beckmann went around to where Leeds was stationed and told him that from what he heard it sounded "like they were ballooning up stuff in the house." "Ballooning up" means "preparing it; putting the narcotics in the balloon," and "stuff" means "narcotics such as heroin." Thereupon, Leeds knocked on the door announcing they were police officers. Immediately they heard a "large commotion" coming from the kitchen, then *312 the sound of someone running through the living room toward where the bathroom was located. Believing they were "going to get rid" of the narcotics in the bathroom, the officers pushed the door open and walked into the living room. Leeds saw the defendant in the kitchen at the table in the process of getting up and away from the chair on which he had been sitting. In one hand he had a large quantity of heroin on a piece of paper and in the other a metal funnel. Seeing the officers, he moved toward the kitchen window and threw the heroin and funnel; they landed on a bench built against the wall in the breakfast nook. Beverly Johns was standing at the north side of the table. Leeds "grabbed" the defendant who came down on the table, turning it up endwise; they both fell on the floor. After pulling defendant to his feet, Leeds turned him over to Officer Dreese and picked up the loose narcotics which had been thrown on the floor, and some balloons, a funnel, a strainer, an eyedropper, two needles and a one- fourth teaspoon which had fallen to the floor when the table overturned. Hearing a scraping sound, Leeds lifted the blind of the window and saw Fisher climb out of the bathroom window, over the railing of the balcony and drop to the ground. Leeds pursued him on foot, took him into custody at a printing shop and returned him to the apartment where he found a marijuana cigarette in the pocket of Fisher's sport shirt hanging in the closet. After his arrest, defendant Wilkins told the officers that someone had "scored the stuff" for him that morning, "a half piece"; that he had paid $125 for it and was just "ballooning it up" and that it was all his "stuff."
 Appellant appears here in propria persona. His Opening Brief consists mainly of the citation of the rule of People v. Cahan (44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513]), and various cases with little factual similarity, and an extensive argument on the evidence urging inferences contrary to those drawn by the trial court--an argument which might well have been directed to the trier of fact but which is here neither proper nor effective. [1, 2] This court is bound to accept all evidence and all reasonable inferences therefrom supportive of the trial court's finding of reasonable cause (People v. Newland, 15 Cal.2d 678 [104 P.2d 778]; People v. Daugherty, 40 Cal.2d 876 [256 P.2d 911]; People v. Thomas, 25 Cal.2d 880 [156 P.2d 7]); and the weight to be accorded the information upon which the officers acted in making the arrest was essentially for the trial court's determination in the exercise of its sound discretion. (People v. Taylor, 176 Cal.App.2d 46 *313 [1 Cal.Rptr. 86]; People v. Arter, 169 Cal.App.2d 439 [337 P.2d 534]; Lorenzen v. Superior Court, 150 Cal.App.2d 506 [310 P.2d 180].)
 [3] Inasmuch as the police officers had no warrant, for the arrest to be valid they must have had reasonable cause to believe the defendant committed a felony. (Pen. Code, 836, subd. 3.) [4] There being no formula for its determination, what constitutes "reasonable cause" depends upon the facts and circumstances of each case (Go-Bart Importing Co. v. United States, 282 U.S. 344 [51 S.Ct. 153, 75 L.Ed. 374]; People v. Ingle, 53 Cal.2d 407 [2 Cal.Rptr. 14, 348 P.2d 577]; People v. Gambos, 181 Cal.App.2d 556 [5 Cal.Rptr. 440]; People v. Wickliff, 144 Cal.App.2d 207 [300 P.2d 749]; People v. Hollins, 173 Cal.App.2d 88 [343 P.2d 174]); and the trial court shall, in a given case, consider the situation presented or apparent to the officers at the time they were required to act. (People v. Evans, 175 Cal.2d 274 [345 P.2d 947]; People v. Hollins, 173 Cal.App.2d 88 [343 P.2d 174]; People v. Silvestri, 150 Cal.App.2d 114 [309 P.2d 871].) In this connection the rule relating to the credibility of the witnesses and the weight of the evidence should be borne in mind, as well as the fact that the lower court, as it had a right to do, accepted as true the testimony of the police officers and all reasonable inferences therefrom in support of their lawful conduct.
 [5] "Reasonable cause" is defined by our Supreme Court "to be such a set of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime. (Citation.) [6] Probable cause has also been defined as having more evidence for than against; supported by evidence which inclines the mind to believe, but leaves some room for doubt. (Citations.)" (People v. Ingle, 53 Cal.2d 407, 412-413 [2 Cal.Rptr. 14, 348 P.2d 577]; People v. Fischer, 49 Cal.2d 442 [317 P.2d 967]; Bompensiero v. Superior Court, 44 Cal.2d 178 [281 P.2d 250]; People v. Kilvington, 104 Cal. 86 [37 P. 799, 43 Am.St.Rep. 73].)
 [7] Viewing the facts and circumstances presented or apparent to Officers Beckmann, Leeds and Dreese at the time they entered the premises and arrested the defendant (People v. Ingle, 53 Cal.2d 407 [2 Cal.Rptr. 14, 348 P.2d 577]; People v. Tisby, 180 Cal.App.2d 574 [5 Cal.Rptr. 614]; People v. Cantley, 163 Cal.App.2d 762 [329 P.2d 993]), we deem the information sufficient to lead them to believe that he had in his possession heroin in violation of section 11500 and had *314 committed, and was still in the process of committing, a felony. The evidence is more than ample to support the lower court's finding of "reasonable cause" in denying the motion to suppress the evidence.
 There is here present a number of sources from which the officers obtained facts relative to defendant's activities in the kitchen of apartment A immediately prior to his arrest; and a variety of factors making up the circumstances then apparent to the officers contributing to the state of facts confronting them immediately before they entered the dwelling and effected the arrest, and valid as that constituting what the officers, as men of ordinary care and prudence were entitled to rely upon in forming the opinion defendant had committed a felony. They consisted of--knowledge of narcotics offenses and familiarity with the parlance, language and items used in their commission, acquired by them as officers long experienced in narcotic activities; information concerning defendant's appearance, habits, conduct and past criminal record (People v. Escobosa, 179 Cal.App.2d 751 [3 Cal.Rptr. 917]; People v. Taylor, 176 Cal.App.2d 46 [1 Cal.Rptr. 86]; People v. Taylor, 174 Cal.App.2d 448 [344 P.2d 837]; People v. Hollins, 173 Cal.App.2d 88 [343 P.2d 174]); personal acquaintance with defendant for four or five years and his previous arrest for the possession of narcotics, for which he was convicted; the officers' purpose in going to the location in the first instance to look for Fisher, and their observation of defendant's car in the immediate vicinity; information from the manager concerning the whereabouts of Fisher, that a man fitting defendant's description was then in Fisher's apartment, and that a good deal of suspicious traffic had been going in and out of the apartment, from which it might be inferred that there was a source of supply that they sought in common (People v. Williams, 175 Cal.App.2d 774 [1 Cal.Rptr. 44]), and which information, although obtained through a third person and perhaps not admissible on the issue of guilt, may be considered in determining reasonable cause (People v. Boyles, 45 Cal.2d 652 [290 P.2d 535]; People v. Gambos, 181 Cal.App.2d 556 [5 Cal.Rptr. 440]); conversation of an incriminating nature relative to "balloons," and a "funnel," of common usage in the narcotics trade issuing from the apartment (People v. Daley, 172 Cal.App.2d 311 [342 P.2d 335]; People v. Smith, 166 Cal.App.2d 302 [332 P.2d 208]; People v. Ruiz, 146 Cal.App.2d 630 [304 P.2d 175]; People v. Hames, 173 Cal.App.2d 673 [343 P.2d 785]); and the incriminating *315 sounds of "snapping" balloons and commotion in the apartment and traffic to the bathroom upon their knock and announcement they were police officers, from which they might reasonably infer that contraband was being destroyed. (People v. Williams, 175 Cal.App.2d 774 [1 Cal.Rptr. 44]; People v. White, 167 Cal.App.2d 794 [334 P.2d 963].)
 Appellant argues that a funnel in the kitchen is normal; that a man having children might well have balloons in his possession; and that "going to the bathroom" is a "natural act" and an officer eavesdropping outside the door hearing someone "heading toward the bathroom" does not give him reasonable cause to enter the premises. Beverly Johns' statement to the police officers that she was in the apartment to retrieve her underwear which she had previously left there, makes appellant's efforts to convince us this was just an ordinary normal household with children who played with balloons as toys, less than successful. Although, some of the circumstances standing alone might lend themselves to a reasonable inference consistent with innocence, considered in the light of all the facts, there is only one reasonable inference resulting from the evidence and that is one entirely and wholly consistent with defendant's unlawful activity in handling narcotics.
 People v. Brown, 45 Cal.2d 640 [290 P.2d 528]; People v. Harvey, 156 Cal.App.2d 516 [319 P.2d 689]; People v. Goodo, 147 Cal.App.2d 7 [304 P.2d 776]; People v. Thymiakas, 140 Cal.App.2d 940 [296 P.2d 4]; and People v. Colonna, 140 Cal.App.2d 705 [295 P.2d 490], cited by appellant and distinguishable on their facts from the case at bar, give little comfort to his position; and only more strongly point up the fundamental rule that "reasonable cause" must be determined in each individual case on its own facts.
 [8] Having reasonable cause to believe defendant had been engaged in the commission of a felony and was then still in possession of narcotics in violation of section 11500, and having made their presence outside the door known to the defendant and believing from the incriminating sounds issuing from within that contraband was being destroyed, Officer Leeds properly used what force was necessary to immediately gain entrance to the premises. Leeds testified that upon knocking on the door and announcing that they were police officers he heard a large commotion coming from the kitchen and the sound of someone running through the living room to where the bathroom was located. Believing that defendants were *316 trying to dispose of the narcotics in the bathroom, Leeds pushed the door open with his shoulder. The officer was well within his rights in springing the door. No civil rights of the defendant were involved. To have further delayed entry might well have provided the occupants sufficient time within which to destroy the narcotics, and it was not improper for the law enforcement officers to push open the door and enter as they did. (People v. Maddox, 46 Cal.2d 301 [294 P.2d 6]; People v. Guerrera, 149 Cal.App.2d 133 [307 P.2d 940]; People v. Shelton, 151 Cal.App.2d 587 [311 P.2d 859]; People v. Ruiz, 146 Cal.App.2d 630 [304 P.2d 175]; People v. White, 167 Cal.App.2d 794 [334 P.2d 963]; People v. Williams, 175 Cal.App.2d 774 [1 Cal.Rptr. 44].)
 [9] As to the appellant's contention that there was an unlawful search, the evidence plainly reveals that the evidence the officers found in the apartment was not the result of a search. (People v. Murphy, 173 Cal.App.2d 367 [243 P.2d 273]; People v. Escobosa, 179 Cal.App.2d 751 [3 Cal.Rptr. 917].) The narcotics were in plain sight of the officers in the kitchen when they first entered; they saw defendant standing in the kitchen holding in one hand a piece of paper on which was a quantity of heroin, and in the other a metal funnel. Narcotics and other paraphernalia were on the table which overturned, spilling the contents on the floor when an altercation ensued out of defendant's arrest. However, it is elementary that had it been necessary for the officers, after arresting defendant, to search the premises for the contraband such a search and subsequent seizure would have been lawful as an incident to a valid arrest.
 For the foregoing reasons the judgment is affirmed.
 Fourt, Acting P. J., and Scott (Robert H.), J. pro tem., [fn. *] concurred.
NOTES
[fn. *] *. Assigned by Chairman of Judicial Council.