[L.A. No. 30034. In Bank. Apr. 26, 1973.]

BELINDA JEWELL ALEXANDER, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Marks, Sherman & Schwartz, Burton Marks, Roger S. Hanson and Jonathan K. Golden for Petitioner.

No appearance for Respondent.

Joseph P. Busch, District Attorney, Harry Wood and Donald J. Kaplan, Deputy District Attorneys, for Real Party in Interest.

## OPINION

**TOBRINER, J.**—Defendant petitions under Penal Code section 1538.5 for an order compelling the superior court to quash a search warrant, to suppress evidence seized pursuant to that warrant, and to dismiss the charges against her. For the reasons discussed below, we conclude that a writ of mandate should issue compelling the quashing of the warrant and suppression of the evidence.

The facts may be summarized briefly. The police obtained a warrant to search defendant's apartment at 1155 N. La Cienega, apartment 1100, Los Angeles. The search resulted in the seizure of less than one gram of heroin and a large quantity of plastic bags—the evidence defendant seeks to suppress.

The relevant details of the affidavit executed by Police Officer McKnight in support of the search warrant are as follows:

(1) Informant No. One told affiant that he saw William Freedman in possession of at least two kilos of heroin;

(2) Penny Smith told affiant that she purchased two to three ounces of heroin per week from Freedman and stated that the heroin in her possession when she was arrested was so purchased;

(3) Affiant, while keeping Freedman under surveillance, observed him entering the apartment building at 1155 N. La Cienega;

(4) At an interview conducted by affiant's fellow officer, Sergeant Sakoda, affiant witnessed the manager of that apartment building identify Freedman from a photograph as the person who visited apartment 1100 at 1155 N. La Cienega almost every day, staying from fifteen minutes to two hours;

(5) At the same interview, the manager told affiant that he knew the occupant of apartment 1100 as Belinda J. Alexander (defendant). The manager showed affiant a lease indicating defendant as the tenant of that apartment starting October 31, 1969;

(6) The Department of Motor Vehicles informed affiant that the car parked in the stall assigned to apartment 1100 was registered to defendant at 8804 Wonderland Avenue;

(7) Informant No. Two stated to affiant that Freedman kept large quantities of narcotics at a Wonderland Avenue residence where a female known as Belinda "sat" on the stash of narcotics.

The issue for decision is whether the affidavit is sufficient to support the issuance of a warrant for the search of apartment 1100, 1155 N. La Cienega.

A search warrant should only be issued on probable cause. (U.S. Const., Amend. IV; Cal. Const., art. I, § 19; Pen. Code, § 1525.) The requirement of probable cause interposes the magistrate between the police officer's zealous pursuit of suspects and evidence and the citizen's pursuit of privacy and freedom from unreasonable interference. The magistrate's function in this scheme is to render a neutral and detached judgment, not to serve as a perfunctory rubber stamp for the police. (*Aguilar* v. *Texas* (1964) 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509].) ■ To promote the meaningful performance of that function the Supreme Court in *Aguilar* established a two-pronged test requiring that the affidavit set forth (1) "some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were," and (2) "some of the underlying circumstances from which the officer concluded that the informant . . . was 'credible' or his information 'reliable'." (*Aguilar* v. *Texas, supra,* at p. 114 [12 L.Ed.2d at p. 729].)

The instant affidavit provides two components of information about the defendant: (a) Informant No. Two told the officers that Freedman used defendant's former residence on Wonderland Avenue to store large quantities of narcotics,[1] and (b) police surveillance indicated that Freedman, who was

---

[1]The dissent suggests that one can infer from the affidavit that Informant No. Two actually indicated that Freedman "stashed" narcotics at defendant's present La Cienega address, rather than only at her earlier Wonderland Avenue residence. The affidavit reads: "Informant stated that he had observed Freedman involved in [narcotics] activity as late as September, 1970; and he stated that Freedman normally did not keep large quantities of narcotics 'stashed' at [his own residence] but that after being prepared it was kept at a [stash] where a female negro known as Belinda 'sat' on the stash of narcotics. The informant stated that the last time he had contact with this female negro known as Belinda she was living on Wonderland Avenue in the Laurel Canyon area."

Although this statement may be somewhat ambiguous, we believe that the most natural and reasonable interpretation of this language is that the informant indicated only that Freedman stashed narcotics at Belinda's Wonderland address. The affidavit makes no mention of defendant's present residence and gives absolutely no indication, as the dissent speculates, that Freedman told Informant No. Two in September 1970 that he was currently stashing narcotics with Belinda. If the informant actually gave the crucial information which the dissent is willing to "infer," such information clearly should have been—and, we believe, would have been—included in the affidavit.

Moreover, even if we could interpret the statement in question as a declaration by the informant that Freedman was currently stashing narcotics in Belinda's residence (wherever that might be), under *Spinelli* v. *United States* (1969) 393 U.S. 410 [21 L.Ed.2d 637, 89 S.Ct. 584], the affidavit would still be insufficient. Even as

heavily implicated in illegal narcotics activity, regularly visited defendant in her apartment at 1155 N. La Cienega. An examination of these components compels the conclusion that the instant affidavit failed to support the issuance of a warrant to search defendant's apartment.

There can be no question that the information secured from Informant No. Two constituted the fundamental basis for the issuance of the warrant for defendant's residence. Aside from this information, the affidavit reveals only that defendant had frequent visits from a known narcotics dealer; no connection was made between such visits and any criminal conduct. As we discuss below, however, Informant No. Two's statement that Freedman kept large quantities of narcotics at defendant's former residence does not meet either prong of the *Aguilar* test, and, consequently, that tip, in itself, is inadequate to provide probable cause to believe that narcotics were present in defendant's La Cienega apartment.[2]

In *People* v. *Hamilton* (1969) 71 Cal.2d 176 [77 Cal.Rptr. 785, 454 P.2d 681], this court articulated the first prong of the *Aguilar* test, requiring that "the affidavit . . . allege the informant's statement in language that is factual rather than conclusionary and must establish that the informant spoke with personal knowledge of the matters contained in such statement; . . ." (*Id.* at pp. 179-180.) *Hamilton* involved an affidavit which stated that the " 'affiant was informed on July 13, 1967, by [a] confidential reliable informant,' " that defendants had illegal drugs in their possession at a specified address. (*Id.* at p. 179.) We held, "It is the first 'prong' of the *Aguilar* test which strikes the affidavit now before us: that document undertakes absolutely no effort to set forth any of 'the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were. . . .' (*Aguilar* v. *Texas, supra,* 378 U.S. 108, 114 [12 L.Ed.2d 723, 728, 84 S.Ct. 1509].)" (*Id.* at p. 180.) Furthermore, even though the informant alleged that the drugs were kept

"liberally" interpreted by the dissent, the allegation of criminal behavior by the defendant remains a totally conclusionary charge by an unreliable informant; as discussed in text *infra, Spinelli* demonstrates that such a tip, even when slightly corroborated by police investigation, cannot support a finding of probable cause.

[2] For other cases recognizing and applying the requirements of *Aguilar* and finding the involved affidavit to be insufficient, see *People* v. *Scoma* (1969) 71 Cal.2d 332 [78 Cal.Rptr. 491, 455 P.2d 419]; *Price* v. *Superior Court* (1970) 1 Cal.3d 836 [83 Cal.Rptr. 369, 463 P.2d 721]; and *Halpin* v. *Superior Court* (1972) 6 Cal.3d 885 [101 Cal.Rptr. 375, 495 P.2d 1295]. For cases holding the involved affidavit to be sufficient, see *People* v. *Benjamin* (1969) 71 Cal.2d 296 [78 Cal.Rptr. 510, 455 P.2d 438]; *Skelton* v. *Superior Court* (1969) 1 Cal.3d 144 [81 Cal.Rptr. 613, 460 P.2d 485]; *Krauss* v. *Superior Court* (1971) 5 Cal.3d 418 [96 Cal.Rptr. 455, 487 P.2d 1023]; and *People* v. *Superior Court* (1972) 6 Cal.3d 704 [100 Cal.Rptr. 319, 493 P.2d 1183].

in approximately 300 rolls of 10 pills each, we held that this detail was insufficient to permit an inference that the informer "had personal knowledge" of the matter. (*Id.* at p. 181.)

The first prong of the *Aguilar* test as articulated in *Hamilton* was recently applied in *Halpin* v. *Superior Court* (1972) 6 Cal.3d 885 [101 Cal.Rptr. 375, 495 P.2d 1295]. In *Halpin*, the police officer made an oral application for a search warrant, testifying that he had been informed that a well-described person arriving on a flight from San Diego to San Bernardino would take possession of an equally well-described camper truck containing a large quantity of marijuana. We held that this testimony did not satisfy the requirements of *Aguilar* and *Hamilton* since "The magistrate was not provided with a sufficient statement of the underlying circumstances from which he could evaluate the validity of the informer's conclusion that [defendant] was handling, transporting or selling marijuana." (*Halpin* v. *Superior Court, supra,* 6 Cal.3d at p. 893.) The court illustrated the fatal omission as follows: "For example, it is not alleged that the informant personally observed Halpin or others handling or transporting marijuana, or that the informant had had dealings with [defendant] or any other person in connection with the camper. . . ." (*Id.*)

In the instant affidavit, Informant No. Two was quoted as stating that narcotics, "after being prepared [were] kept at a stashed [*sic*] where a female negro known as Belinda 'sat' on the stash of narcotics, . . . that the last time he had contact with this female negro known as Belinda she was living on Wonderland Avenue. . . ." This statement does not inform the magistrate of underlying circumstances from which he could evaluate the validity of Informant No. Two's conclusion that Belinda "sat on a stash of narcotics" at Wonderland Avenue. Nor does the affidavit set forth a scintilla of showing that the informant saw Freedman bring narcotics to defendant's apartment at 1155 N. La Cienega. Freedman may have been a dealer in narcotics but we have not an iota of showing that he visited Belinda at the La Cienega address to "stash" narcotics or that narcotics were "stashed" at that place. The affidavit does not allege that the informant personally observed narcotics in defendant's apartment at either La Cienega or Wonderland Avenue. Nor does the statement set forth details as to the type or quantity of narcotics or the manner of concealment, if any, utilized at either place. We find even less detail here than the description which the court in *People* v. *Hamilton* (1969) 71 Cal.2d 176 [77 Cal.Rptr. 785, 454 P.2d 681], held insufficient to support an inference that the informant spoke from personal knowledge; we conclude that informant No. Two's statement does not satisfy the first prong of the *Aguilar* test.

█ Furthermore, Informant No. Two's statements regarding Belinda's "stash" were stale. The affidavit discloses that Informant No. Two last had contact with Belinda when she lived on Wonderland Avenue and that she took occupancy of apartment 1100 at 1155 N. La Cienega on October 31, 1969. From these facts, it can be inferred that Informant No. Two's information concerning Belinda was at least one year old when presented to the magistrate on November 12, 1970.

As a general rule, information is stale, and hence unworthy of weight in the magistrate's consideration of an affidavit, unless the information consists of "facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." (*Sgro* v. *United States* (1932) 287 U.S. 206, 210 [77 L.Ed. 260, 263, 53 S.Ct. 138, 85 A.L.R. 108]; accord, *People* v. *Sheridan* (1969) 2 Cal.App.3d 483, 490 [82 Cal.Rptr. 695].) No clear cut rule, of course, tells us when the time span must be deemed too attenuated. "The length of the time lapse alone is not controlling since even a brief delay may preclude an inference of probable cause in some circumstances while in others a relatively long delay may not do so. Nonetheless, there are obviously some limits." (*Durham* v. *United States* (9th Cir. 1968) 403 F.2d 190, 194, fn. 6.) The information given by Informant No. Two was over one year old; the informant recites no special circumstances that would justify a man of ordinary prudence to conclude that the alleged illegal activity had persisted for more than a year. Hence, the information was stale.

The second prong of the *Aguilar* test requiring that the affidavit establish the reliability of Informant No. Two also remains unsatisfied. The Supreme Court in *Spinelli* v. *United States* (1969) 393 U.S. 410 [21 L.Ed.2d 637, 89 S.Ct. 584] noted the insufficiency of the fact that the police officer attests to the reliability of the informant; *Aguilar* requires a statement of underlying circumstances from which the officer can conclude that the informant was reliable. Mr. Justice White, in a concurring opinion, stated that the honesty of the informant could be established by a statement of ". . . the officer's previous experience with the informant." (*Spinelli* v. *United States* (1969) *supra,* 393 U.S. at p. 425 [21 L.Ed.2d at p. 649]; accord, *Halpin* v. *Superior Court* (1972) 6 Cal.3d 885, 893, fn. 7 [101 Cal.Rptr. 375, 495 P.2d 1295].) Although the affidavit does contain such a statement indicating the number of arrests and convictions that resulted from information given by Informant *No. One,* the affidavit supplies no such information with respect to Informant *No. Two.* In fact, the affiant police officer did not even attest to the reliability of Informant

No. Two.[3] Thus the affidavit totally lacked allegations concerning the reliability of this informant—the second prong of the *Aguilar* test was not met.

It is clear, therefore, that Informant No. Two's statement was not sufficient in itself to provide the basis for a finding of probable cause with respect to the La Cienega address. Moreover, the additional information in the affidavit does not lend any significant support to the unreliable tip and certainly does not cause "the suspicions engendered by the informant's report to ripen into a judgment" that narcotics were probably being stored in defendant's La Cienega apartment. (See *Spinelli* v. *United States* (1969) *supra,* 393 U.S. 410, 418 [21 L.Ed.2d 637, 644-645].)

The additional allegations of the affidavit reveal only that Freedman, who for these purposes is conceded to be a narcotics dealer, visited defendant in her apartment quite regularly. Mere association with Freedman, without some reliable showing of recent criminal activity, however, fails to establish a sufficient basis to subject defendant to the invasion which a search entails.

In *People* v. *Nadell* (1972) 23 Cal.App.3d 746 [100 Cal.Rptr. 444], the affidavit sought to implicate defendant by stale and conclusionary allegations of criminal activity coupled with detailed factual allegations of defendant's acquaintance with various known bookmakers and of visits by them to his home. The court held that an "affidavit [which] proves no more than that, on one occasion (inferentially three years before), there was reliable information that this defendant was engaged in bookmaking, . . . that he still carries on an acquaintanceship with . . . bookmakers (the nature of that relationship being unexplained), and that street gossip implicates him in current bookmaking activity . . . is not sufficient." (*Id.* at p. 756.) The court did not consider the visits by known bookmakers to defendant's home significant because, "there was no showing of criminal activity therein." (*Id.* at p. 756.) The instant affidavit similarly lacks factual support for the conclusion that Freedman's present visits to de-

---

[3]In *United States* v. *Harris* (1971) 403 U.S. 573 [29 L.Ed.2d 723, 91 S.Ct. 2075], Chief Justice Burger held that where the affiant police officer attests in conclusionary terms that the informant is reliable, the informant's statement contains detailed factual allegations indicating that he was speaking from personal knowledge, and the informant's statements represent admissions against interest, the reliability of the informant is sufficiently established to support the issuance of a search warrant. The instant affidavit does not contain even a conclusionary statement of Informant No. Two's reliability. Furthermore, Informant No. Two's statements concerning defendant are not detailed factual allegations indicating that he was speaking from personal knowledge but are purely conclusionary. Informant No. Two's statements did not represent admissions against interest. Thus, *Harris* does not affect the instant case.

fendant's residence involved criminal activity, and hence the allegations of regular visits do not provide the additional support necessary to justify the issuance of the warrant.

The case of *Spinelli* v. *United States* (1969) *supra*, 393 U.S. 410 is also directly in point. In *Spinelli*, the key portion of a challenged affidavit was a conclusionary tip from an unreliable informant that the defendant was operating a gambling operation by use of two specific telephone numbers. Police surveillance of Spinelli revealed a series of visits to an apartment which contained the telephone referred to by the informant, but the surveillance uncovered no evidence of criminal activity. The *Spinelli* court concluded that the unreliable tip, even when partly corroborated by the police investigation, was not an adequate basis for a finding of probable cause, and the court suppressed the evidence which had been obtained pursuant to the warrant.

In the instant case, as in *Spinelli,* the crucial component of the questioned affidavit is a tip from an unreliable informant averring, in conclusionary terms, that a named narcotics dealer previously used defendant's former residence as a "stash" for narcotics. Although independent police investigation did reveal that the narcotics dealer regularly visted the defendant (at a new address, however), as in *Spinelli* the police surveillance failed to connect defendant with any criminal activity.[4] Under these circumstances, we believe the holding in *Spinelli* directly supports our conclusion that the instant affidavit is inadequate to satisfy the governing state and federal constitutional standards.

Thus we conclude that the affidavit, resting primarily on a conclusionary and stale tip from an unreliable informant, and uncorroborated by sufficient evidence of current criminal activity on the part of defendant, is insufficient to support the issuance of the instant search warrant. Since the record does not indicate whether the district attorney possesses other evidence sufficient to bring defendant to trial, we do not order a dismissal of the proceeding against defendant.

Let a peremptory writ of mandate issue directing the respondent superior court to quash the warrant authorizing search of defendant's residence at

---

[4]Although the dissent attempts to distinguish the instant case from *Spinelli* on the grounds that the police investigation in the instant case corroborated the informant's revelations as to *Freedman's* criminal activity, the significant factor is that there was no similar corroboration as to any criminal activity on the part of the *instant defendant*. Indeed, in some respects, the instant case is a stronger case for suppression than *Spinelli,* for the specificity of the information related in *Spinelli*—involving particular telephone numbers—gave the informant's information an aura of reliability not present in the totally conclusionary averments made with respect to Belinda's "stash."

1155 N. La Cienega, apartment 1100, Los Angeles, and directing the court to suppress the evidence obtained in the execution of the warrant.

Wright, C. J., Mosk, J., and Sullivan, J., concurred.

**BURKE, J.**—I disagree with the majority's conclusion that the affidavit is insufficient to support the issuance of the warrant for the search of defendant's apartment. In reaching that conclusion the majority, among other things, has omitted relevant facts alleged in the affidavit that are relied upon by the People and support the magistrate's action in issuing the search warrant.

The superior court denied defendant's motion under Penal Code section 1538.5 to suppress evidence obtained under the warrant, and the Court of Appeal upheld the superior court's action. I cannot agree with the majority that all three courts erred in approving the issuance of the warrant.

It is settled that a magistrate's resolution of the issue of probable cause "is to be sustained by reviewing courts as long as there was a 'substantial basis' for his conclusion that legitimate objects of the seach were 'probably present' on the specified premises" (see *Skelton* v. *Superior Court,* 1 Cal.3d 144, 153 [81 Cal.Rptr. 613, 460 P.2d 485]), and that a warrant can be upset by an appellate court "only if the affidavit fails *as a matter of law* to set forth sufficient competent evidence supportive of the magistrate's finding of probable cause, since it is the function of the trier of fact, not the reviewing court, to appraise and weigh evidence when presented by affidavit as well as when presented by oral testimony." (Italics added; *id.,* at p. 150; in accord, *People* v. *Benjamin,* 71 Cal.2d 296, 302 [78 Cal.Rptr. 510, 455 P.2d 438].)

We are bound to accept all reasonable inferences in support of the finding of reasonable cause (see *People* v. *Anthony,* 7 Cal.App.3d 751, 762 [86 Cal.Rptr. 767]; *People* v. *Fisher,* 184 Cal.App.2d 308, 312 [7 Cal.Rptr. 461]; *People* v. *Kirk,* 109 Cal.App.2d 203, 207 [240 P.2d 630]), and when two or more inferences can reasonably be deduced from the facts we cannot substitute our deduction for that of the trial court (see *Yakov* v. *Board of Medical Examiners,* 68 Cal.2d 67, 72 [64 Cal.Rptr. 785, 435 P.2d 553]). Also, courts should not invalidate a warrant by interpreting it in a hypertechnical, rather than commonsense, manner, and "the resolution of doubtful or marginal cases . . . should be largely determined by the preference to be accorded to warrants." (*United States* v. *Ventresca,* 380 U.S. 102, 109 [13 L.Ed.2d 684, 689, 85 S.Ct. 741]; in accord, *People* v. *Superior Court (Johnson)* 6 Cal.3d 704, 711 [100 Cal.Rptr. 319, 493 P.2d 1183].)

Here the affidavit upon which the warrant was issued was made and submitted to the municipal court on November 12, 1970, by an experienced narcotics officer, who stated that he had reason to believe that heroin and narcotic paraphernalia were at defendant's apartment, namely, apartment 1100 at 1155 North La Cienega Boulevard in Los Angeles. The grounds for this belief are alleged in detail in the affidavit and, as we shall see, the magistrate could reasonably conclude from those allegations that there was probable cause to believe that one William Freedman trafficked in heroin and that he kept heroin and narcotic paraphernalia at defendant's apartment on La Cienega. The allegations may be summarized as follows:

In December 1969 affiant received information from a confidential reliable informant [hereafter called Informant No. One] that Freedman was actively involved in heroin and cocaine traffic throughout California and that the informant was present when Freedman had in his possession as much as two kilos of heroin. In the past this informant has given information resulting in six arrests and the seizure of narcotics, and three of the arrestees were held to answer and three are awaiting preliminary hearings.

In September 1970 affiant interviewed Penny Smith, who was arrested with heroin in her possession, and she stated that this heroin was purchased from Freedman, that she was "scoring" several ounces of heroin weekly from him, and that "at one time Freedman had employed her as a runner during which she transported large quantities of heroin to San Francisco . . . ."

On October 6, 1970, affiant was told by a second confidential informant [hereafter called Informant No. Two]: "[A]t one time [this informant] was engaged in narcotics activity with . . . Freedman . . . . Freedman was dealing large quantities of heroin and cocaine . . . and was sending large quantities of cocaine and heroin to San Francisco and . . . used runners who would transport the narcotics to San Francisco by commercial aircraft. . . . Informant had personally been to Freedman's residence at Marina Del Ray and had seen Freedman preparing as much as a kilo of heroin for sale. Informant . . . had observed Freedman involved in this activity as late as September, 1970; and . . . Freedman normally did not keep large quantities of narcotics 'stashed' at the Marina, but . . . after being prepared it was kept at a stashed [*sic*] where a female negro known as Belinda 'sat' on the stash of narcotics . . . . [T]he last time [the informant] had contact with . . . Belinda she was living on Wonderland Avenue . . . ." Freedman lived at 4782 La Villa Marina, apartment H, with a female known as Christy and drove a motorcycle, a 1961 black Porsche, and a 1957 black Ranchero.

The affidavit further alleges facts corroborating Informant No. Two's statements regarding Freedman's address, the person with whom Freedman lived, and the vehicles Freedman drove.[1]

On November 11, 1970, affiant was advised by Sergeant Sakoda that he observed Freedman "enter apartment 1100" at 1155 North La Cienega,[2] and it may be inferred that the observation was on that same day.

At an interview by Sergeant Sakoda of the manager of that apartment house in affiant's presence, which interview it may be inferred was on November 11, 1970, the manager, after being shown a picture of Freedman, stated "that he had observed the person in the photograph often and that he normally would observe this person drive into the apartment parking area . . . and that he would go to apartment 1100 and visit a female negro . . . known . . . as Belinda J. Alexander." The manager further stated that Freedman visited the apartment most every day, remaining 15 minutes to two hours and that Belinda rarely left the apartment. The manager showed affiant a lease indicating that the apartment was leased to Belinda Alexander as of October 31, 1969.

A check through "DMV" revealed the license to the car in the stall assigned to apartment 1100 was registered to Belinda J. Alexander, 8804 Wonderland.

The affidavit also contains (1) a recital of matters observed by Sergeant Sakoda from which it may be inferred that on November 12, 1970, Freed-

---

[1]Affiant was told by Informant No. One in July 1970 that Freedman lived at 4782 La Villa Marina, apartment H, with Christy Freedman, and in November 1970 affiant observed Freedman enter that apartment. Affiant made a utility check regarding the apartment and found that the utilities were registered to Christy "Freeman" as of April 3, 1969. Affiant also checked telephone records and found a number listed to Christine McDonald at that address. In November 1970 affiant observed Freedman and a female, who fit the description given by the informant of Christy, in a 1961 black Porsche. Affiant also observed the same female drive a 1957 black Ranchero. Affiant saw the license numbers of the two cars, and a check with "DMV" records revealed the cars were registered to Freedman at an address in Burbank.

[2]At the superior court hearing Sakoda testified: He did not see Freedman *enter* defendant's apartment and correctly told affiant that Sakoda saw Freedman *come out* of that apartment. Sakoda, who was behind a partially closed door, heard a door opening and on peeking saw Freedman right by the door to apartment 1100 and the next door was several feet away.

The discrepancy between the affidavit and Sakoda's testimony manifestly did not significantly detract from the affidavit.

man was involved in a narcotics transaction[3] and (2) allegations indicating Freedman has a narcotics record.[4]

In concluding that the affidavit is insufficient to show probable cause to believe that heroin and narcotics paraphernalia were in defendant's apartment on La Cienega, the majority states, inter alia, that "Informant No. Two's statement that Freedman kept large quantities of narcotics at defendant's former residence[5] does not meet either prong of the *Aguilar* test"[6] and that "the additional information in the affidavit does not lend any significant support to [that informant's] tip . . . ." I agree that if Informant No. Two's report is considered by itself at least one prong of *Aguilar* is not met, but in my opinion when that informant's entire report (not merely the portion thereof that the majority isolates and inaccurately describes (see fn. 5, *ante*) is considered together with all the corroborating information in the affidavit (not merely .the limited portion thereof the majority mentions) there is sufficient corroboration so that the magistrate could properly conclude that reliance on that informant's report is reasonable.

Considering Informant No. Two's report apart from the affidavit's other allegations that corroborated information in that report, it is clear

[3]The affidavit recites: On November 12, 1970, surveillance of Freedman's residence was maintained by Sergeant Sakoda, who related the following information to affiant: Officers followed Freedman and Christy from that residence to a location in Los Angeles where Freedman and Christy met Harvey Gonick. Sakoda observed Freedman enter Gonick's car and remain about five minutes and leave. Sakoda then saw Gonick place a package in the trunk. Gonick reentered his car and drove to the airport where he parked. Officers believing that a narcotics transaction had taken place, arrested Gonick. Sakoda retrieved the package from the trunk and found it contained a powder resembling cocaine.

[4]The affidavit alleges: Affiant was advised by named United States Customs agents that William Freedman had been arrested by United States Customs in December 1968 for conspiracy to smuggle narcotics and was told by one of the agents in October 1970 that Freedman had been convicted in federal court as a result of the agents' investigation and was presently out on appeal bond.

[5]The majority's above statement and other similar statements are erroneous in that Informant No. Two did not qualify "residence" by the word "former." In adding that qualification, the majority has drawn an inference contrary to one the magistrate and superior court reasonably could have drawn. This matter is discussed later herein in connection with the majority's claim that the information was stale.

[6]As stated by the majority, *Aguilar* v. *Texas*, 378 U.S. 108, 114 [12 L.Ed.2d 723, 728, 84 S.Ct. 1509], established a two pronged test requiring that the affidavit set forth (1) "some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were," and (2) "some of the underlying circumstances from which the officer concluded that the informant . . . was 'credible' or his information 'reliable,' " and *People* v. *Hamilton*, 71 Cal.2d 176, 179-180 [77 Cal.Rptr. 785, 454 P.2d 681], articulated the first prong of the *Aguilar* test, requiring that, "the affidavit . . . allege the informant's statement in language that is factual rather than conclusionary and must establish that the informant spoke with personal knowledge of the matters contained in such statement; . . . ."

that the second prong of *Aguilar* is not met. It does not appear that the police had prior experience with that informant or that his identity was such as to indicate his reliability. (See *People* v. *Scoma,* 71 Cal.2d 332, 338 [78 Cal.Rptr. 491, 455 P.2d 419].)[7] With respect to the first prong of *Aguilar,* however, it is at least arguable that this prong is met. Although there is no explicit statement in the affidavit as to the basis of Informant No. Two's statement regarding Belinda's "sitting" on the narcotics for Freedman, as heretofore appears, the affidavit alleges that this informant stated that he "at one time . . . was engaged in narcotic activity with . . . Freedman," "had personally been to Freedman's residence and had seen him preparing . . . heroin for sale," "observed [Freedman] involved in this activity as late as September, 1970," and had "contact" with Belinda on Wonderland Avenue. The allegations, read in a commonsense rather than hypertechnical manner (see *United States* v. *Ventresca, supra,* 380 U.S. 102, 109), arguably might be viewed as indicating that the informant obtained his information as to the location of Freedman's "stash" in a reliable way such as being told thereof by Freedman[8] or personal observation rather than through gossip or rumor. But even if the allegations regarding Informant No. Two's report are insufficient in themselves to comply with the first prong of *Aguilar* and even though the informer was previously untested, a magistrate could properly issue a warrant on the basis of such an informer's report if the supporting affidavit also recites facts indicating that reliance on the information is reasonable. (*People* v. *Flores, supra,* 68 Cal.2d 563, 564-565; see *People* v. *Superior Court (Johnson) supra,* 6 Cal.3d 704, 712.) The question the magistrate must ask is "Can it fairly be said that the tip, even when certain parts of it have been corroborated by independent sources, is as trustworthy as a tip which would pass *Aguilar's* tests without independent corroboration?" (*Spinelli* v. *United States,* 393 U.S. 410, 415 [21 L.Ed.2d 637, 643, 89 S.Ct. 584].)

Here in addition to the allegations detailing the police investigation

---

[7]The majority notes that the affiant did not "even attest to the reliability of Informant No. Two." Such a declaration is not essential " 'if the supporting affidavit . . . recites facts indicating that reliance on the information is reasonable.' " (*People* v. *Flores,* 68 Cal.2d 563, 566 [68 Cal.Rptr. 161, 440 P.2d 233] [cert. den., 393 U.S. 1057 (21 L.Ed.2d 698, 89 S.Ct. 697); overruled on another issue in *People* v. *De Santiago,* 71 Cal.2d 18, 28, fn. 7 (76 Cal.Rptr. 809, 453 P.2d 353)].)

[8]*Price* v. *Superior Court,* 1 Cal.3d 836, 841 [83 Cal.Rptr. 369, 463 P.2d 721], questioned, but did not decide, whether a warrant might be issued upon an informant's hearsay which in turn is based on hearsay. In my opinion it may be where there is good reason for crediting the hearsay upon hearsay, such as where the informer's hearsay comes from one of the actors in the crime in the nature of an admission against interest (see *Spinelli* v. *United States, supra,* 393 U.S. 410, 425 [21 L.Ed.2d 637, 649] [concurring opn. by White, J.]), and it appears that the informant was credible or his information reliable.

and report of the apartment house manager[9] that corroborated information furnished by that informant regarding Freedman generally (e.g., the fact Freedman and Belinda were acquainted, Freedman's residence, and the vehicles he drove), there was corroboration of part of that informant's statements regarding Freedman's criminal activity. The portion of that informant's report indicating that Freedman trafficked in cocaine and heroin was corroborated by the personal observation of Sergeant Sakoda and the information from Informant No. One and Penny Smith, both of whom purported to speak from personal knowledge, and Informant No. One's reliability was established by, among other things, the allegations that he previously furnished information resulting in six arrests and the seizure of narcotics and that three of the arrestees were held to answer and three are awaiting trial (see *People* v. *Keener,* 55 Cal.2d 714, 717, 721 [12 Cal.Rptr. 859, 361 P.2d 587] [disapproved on another issue in *People* v. *Butler,* 64 Cal.2d 842, 845 (52 Cal.Rptr. 4, 415 P.2d 819)]). And even more significantly, the portion of Informant No. Two's report that Freedman used runners to transport large quantities of heroin to San Francisco was corroborated by Penny Smith's report that "at one time Freedman had employed her as a runner during which she transported large quantities of heroin to San Francisco." Manifestly she purported to speak from personal knowledge. Her statement constituted an admission of crime, and such an admission carries its own indicia of credibility (see *United States* v. *Harris,* 403 U.S. 573, 583 [29 L.Ed.2d 723, 733, 91 S.Ct. 2075]). Although admissions of crime "do not always lend credibility to contemporaneous . . . accusations of another" (*id.,* at p. 584 [29 L.Ed. 2d at p. 734]), here the corroborating matters alleged in the affidavit showing that over a substantial period of time Freedman trafficked in narcotics, made it reasonable to believe Penny Smith's statement. In view of the corroboration of a substantial portion of Informant No. Two's report including part of Freedman's modus operandi (i.e., his use of runners to transport large quantities of heroin to San Francisco), it was apparent that Informant No. Two had not fabricated his report out of whole cloth, and with so much of that report verified the magistrate could reasonably infer that the statement by that informant about the location of Freedman's narcotics was probably likewise true. (See, e.g., *Draper* v. *United States,* 358 U.S. 307, 313 [3 L.Ed.2d 327, 332, 79 S.Ct. 329]; *People* v. *Talley,* 65 Cal.2d 830, 836 [56 Cal.Rptr. 492, 423 P.2d 564]; *Galena* v. *Municipal Court,* 237 Cal.App.2d 581, 589-590 [47 Cal.Rptr. 88].)

---

[9]Although the apartment house manager did not expressly state that she had seen Freedman go to defendant's apartment, her statements, interpreted in a commonsense rather than hypertechnical manner (see *United States* v. *Ventresca, supra,* 380 U.S. 102, 109), may be so construed.

The magistrate therefore could reasonably conclude that the report of that informant, when partially corroborated by independent sources, is as trustworthy as a tip which would pass *Aguilar's* tests without independent corroboration.

This case differs from *Spinelli* v. *United States, supra,* 393 U.S. 410, upon which the majority relies. In *Spinelli* the affidavit alleged that the FBI was informed by a confidential reliable informant that Spinelli was operating a handbook and accepting wagers by means of telephones with two specified numbers. The affidavit further contained (1) a flat statement that Spinelli was "known" to the FBI as a gambler and (2) detailed facts from which it appeared that independent investigation by the FBI verified that Spinelli on one day visited the apartment which contained the telephones with the specified numbers and on several days parked at the lot used by residents of that apartment house. With respect to the foregoing flat statement, *Spinelli* stated (393 U.S. at pp. 418-419 [21 L.Ed.2d at p. 645]), "[J]ust as a simple assertion of police suspicion is not itself a sufficient basis for a magistrate's finding of probable cause, we do not believe it may be used to give additional weight to allegations that would otherwise be insufficient." *Spinelli* further concluded that the allegations detailing the FBI's independent investigative efforts failed to adequately corroborate the informant's report. *Spinelli* stated (at p. 417 [21 L.Ed.2d at p. 644]) that "At most, these allegations indicated that Spinelli could have used the telephones specified by the informant for some purpose" and (at p. 418 [21 L.Ed.2d at p. 645]) that these allegations "contain no suggestion of criminal conduct when taken by themselves." Here considerably more details of the informer's report were verified than was the case in *Spinelli,* and here, unlike *Spinelli,* the allegations setting forth the corroborating matters, considered alone, show criminal conduct.

The majority considers it significant that in the present case there was "no . . . corroboration of any criminal activity on the part of the *instant defendant*"—that insofar as she is concerned the corroboration showed merely that a narcotics dealer regularly visited her apartment. The majority believes that *Spinelli* is therefore controlling. However, nowhere in *Spinelli* is it stated that corroboration of the type presumed essential by the majority is required, nor has the majority cited any other authority imposing such a requirement. And such a requirement is unreasonable. The issue is whether there is a substantial basis for the magistrate's conclusion that legitimate objects of the search were probably present on the premises to be searched, and in view of Informant No. Two's proven familiarity with matters relating to Freedman and his criminal operations it was reasonable

to believe that Informant No. Two was correct as to the location of Freedman's narcotics supply.

But states the majority, Informant No. Two's statements regarding Belinda's "stash" were stale. The majority notes that the affidavit discloses that Informant No. Two's last contact with Belinda was when she lived on Wonderland Avenue and that she took occupancy of apartment 1100 at 1155 North La Cienega on October 31, 1969. The majority states "From these facts, it can be inferred that Informant No. Two's information concerning Belinda was at least one year old when presented to the magistrate on November 12, 1970." Such an inference, however, is contrary to one that the magistrate and superior court reasonably could have drawn from the affidavit. As heretofore shown, according to the affidavit, Informant No. Two stated on October 6, 1970, that Freedman "was dealing large quantities of heroin and cocaine," that the informant in question "had observed Freedman involved [in preparing heroin for sale] as late as September, 1970,"[10] and that "Freedman normally did not keep large quantities of narcotics 'stashed' at the Marina but . . . after being prepared it was kept at a stashed [*sic*] where . . . Belinda [sat] on [it]." From these allegations it may be inferred that at least as of September 1970 Freedman was dealing in narcotics and storing them at Belinda's. This inference is not precluded by Informant No. Two's further statement that he had not had contact with Belinda since she lived on Wonderland Avenue, because he could, of course, have been told of the narcotics by Freedman or seen the narcotics at Belinda's apartment without having contact with her.

It further may be inferred from the allegations in the affidavit previously set forth that up until the date the warrant was issued Freedman continued to deal in narcotics and to visit Belinda regularly at her apartment on La Cienega. Nothing in the affidavit shows that he stopped keeping narcotics at Belinda's.[11] And since there was probable cause to believe he trafficked in narcotics and stored narcotics at Belinda's, it was not unreasonable to believe that he probably likewise kept narcotic paraphernalia at her apartment.

---

[10]The affidavit, heretofore quoted, indicates that the activity Informant No. Two reported having observed Freedman engaged in as late as September 1970 was "preparing heroin for sale"—not merely "[narcotics] activity" as the majority herein states.

[11]Penny Smith's report is not contrary to the above statement. According to the affidavit, she "was arrested in possession of . . . heroin and during a subsequent interview your affiant received information from [her] that she was scoring two or three ounces of heroin weekly from . . . Freedman. She stated that Freedman

From the facts alleged in the affidavit and the reasonable inferences therefrom, the affidavit in my opinion cannot be said as a matter of law to be insufficient to support the magistrate's finding of probable cause, I would deny the writ.

McComb, J., concurred.

---

generally would stash *the heroin* in a telephone booth in the vicinity of" a specified market at a described location. (Italics added.) "[T]he heroin" may reasonably be interpreted to mean the heroin she purchased—not Freedman's entire narcotics supply.