[Crim. No. 20189. Second Dist., Div. Four. Feb. 24, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH BENJAMIN NADELL, Defendant and Appellant.

748

COUNSEL

Lewis, Gershan, Castillo & Song and Arthur Lewis for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Douglas B. Noble, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

KINGSLEY, J.—Defendant Nadell was charged in counts I and V with bookmaking (Pen. Code, § 337a, subd. 1), in counts II and VI with keeping a place for recording bets (Pen. Code, § 337a, subd. 2), in counts III and VII with registering bets (Pen. Code, § 337a, subd. 4), and in counts IV and VIII with making or accepting bets (Pen. Code, § 337a, subd. 6). Defendant pled not guilty to all counts and his motion under section 1538.5 was denied. In a non-jury trial, he was found guilty on counts I and V (bookmaking) and not guilty on the other counts. A jail sentence was imposed, execution was suspended and he was granted probation. He has appealed from the judgment (order granting probation) and from the order denying his motion to suppress. We dismiss the appeal from the non-appealable order and for the reasons set forth below, reverse the judgment.

Officer Danko testified that he conducted an investigation of bookmaking in 1970. He obtained search warrants for a number of persons and places and the resultant searches produced much paraphernalia used in bookmaking operations. Defendant and his apartment were among the objects and persons specified in the warrant. Defendant was present at the time of the search and the search produced two bookmaking records for a sports betting organization, including a recordation of wagers for football games, and the J. K. Sports Journal listing indicating point spreads of various games. The handwriting on the recordation of wagers matched defendant's handwriting.

The search warrant is based on the affidavit of Officer Danko in which he alleged the following in part: "On the date of March 20, 1970, your affiant (received information from) a confidential reliable informant, hereinafter designated as Informant #1, that person known as 'Steve' was engaging in bookmaking, and working as a back office clerk for a large bookmaking organization in Los Angeles. He said that the organization was comprised of a number of known bookmakers in Los Angeles County, including Fred Sica, Chris Patti, Boris Feldman, Al Glassman, Rudy Antonelli, Joe Nadell and Robert Benjamin. He said that 'Steve' had told him that he had been arrested once for bookmaking on an occasion when he was working a phone spot receiving wagers from bettors; that at that time he was working for a bookmaker known as Antone Kaleel, and at the time of his arrest he was in bed wearing only his shorts.

"Armed with this information, your affiant began a search of records of both the Los Angeles Police Department and the Los Angeles County Sheriffs, and discovered the following information: that Antone Kaleel was listed in official police department files as an associate of Stephen Lewis Kahn. Los Angeles County Sheriffs Department records show that Stephen Lewis Kahn was arrested on April 19, 1968, for bookmaking, a violation of Section 337(a) of the Penal Code, and that this was his only arrest for bookmaking. Your affiant interviewed the arresting Sheriffs deputies. Sheriffs Deputy Zimbel told your affiant that he remembered the arrest of Stephen Lewis Kahn on April 19, 1968; that he entered the residence first and observed Kahn in bed dressed in only his shorts.

"Your affiant considers the above-mentioned confidential informant as reliable based upon his past experience with the informant and his belief in his reliability is also founded upon the information presently received from this informant when considered and evaluated in the context of all the facts and circumstances set forth in this Affidavit. Information previously given by him within the last year has resulted in four arrests for bookmaking; charges were filed on all four persons, and all have been convicted.

"On April 2, 1970, your affiant received information from another confidential informant, hereinafter designated as Informant #2, and believed by your affiant to be reliable, that Stephen Lewis Kahn is personally known to him to be presently engaging in bookmaking, and that Kahn speaks with a slight speech impediment and he occasionally stammers when using certain words."

Affiant alleges he had Kahn under surveillance when Kahn left a Gardena card club, and staking out Sica, Patti and Swoboda in March.

The affidavit continues: "Informant #2 told your affiant that Kahn is known to him to be the coordinator and back office clerk for a large Los Angeles bookmaking organization and that Kahn spends a lot of time going around town settling disputes between bettors and bookmakers and conducting financial transactions. He stated that bookmakers Fred Sica, Chris Patti, Al Glassman, Joe Nadell, and Rudy Antonelli use Kahn's services and that Kahn is paid by them to coordinate their bookmaking activities and either bring them money or get money from them to either pay to or collect from bettors."

The affidavit then alleges facts indicating informant #2's reliability. Certain corroborative matter against Kahn was alleged: "Police Sergeant Robert Harris positioned himself in a location to overhear conversation between Kahn and the other man and reported to affiant that he had heard the unknown male state to Kahn, 'I have a $35 bettor coming on.'"

On page 6 of the affidavit, affiant indicates that informant #3 told the officer what number to call to place bets. Facts showing informant #3's reliability are alleged. Informant #3 described in great detail the bookmaking activity of Sica, Patti, Benjamin and Glassman. Nadell was not mentioned. In September, the affiant staked out Sica and Kahn and watched the two exchange money in a gas station from a wrapped package. Kahn went to the Hollywood Park and to the Turf Club there and gave ten $100 bills to Glassman. On September 22, 1970, the affiant received further information related to Kahn's bookmaking and during the world series they observed Benjamin and Kahn. In October the police observed Benjamin stop at many locations in one day on several occasions. Several times in November the affiant observed Kahn driving in circuitous routes stopping at various places. Informant #3 described Kahn's bookmaking activities in some detail on pages 12 and 13 of the affidavit: "On November 17, 1970, at 9:00 a.m., affiant observed Mr. Kahn went to 15440 Sherman Way, after taking a circuitous route and went to apartment No. 315 at that location. This apartment is personally known to your affiant

to be rented by Joe Nadell, and was given by Nadell as his residence address when he applied for his drivers license. Kahn left after 15 minutes at that location."

After describing Kahn's connection with Antonelli, Nadell is mentioned once more: "Informant #2 told your affiant that Joe Nadell had recently gone to Rudy Antonelli and made a deal to have Rudy Antonelli's bookmaking organization service or accept all of his bettors if Antonelli would pay off monies presently owing the bettors from a defunct bookmaking organization and that Antonelli agreed. This information was related to Informant #2, according to him, by a close associate of Rudy Antonelli and Joe Nadell."

The affiant then states that he received information that a police officer saw Patti and Scountzos drive from Patti's residence to a restaurant, where they met Benjamin. The officer observed a J. K. Sports Journal in plain view in the car. Also Patti had thrown into the trash can records of wagers with bettors.

The affiant stated that, based on his expert opinion, Rudy Antonelli, Chris Patti, Fred Sica, Al Glassman, Joe Nadell and Robert Benjamin were involved in a bookmaking operation.

A handwritten page was inserted in the affidavit. It reads as follows: "Your affiant has in the past observed Joe Nadell meeting with a known bookmaker and exchanging money. The bookmaker was subsequently arrested for bookmaking. Your affiant has interviewed citizens who were chosen to testify before a grand jury investigating the bookmaking activities of Joe Nadell and other bookmakers in Los Angeles County. The citizens stated Nadell had introduced them to a bookmaker for the purpose of wagering on sporting events. Nadell supplied these citizens with telephone numbers where they could place bets on sporting events and in fact did use the phones for such activity. Nadell also paid and collected sums of monies owed to bookmakers from the same citizens.

"Your affiant on a previous bookmaking investigation recovered betting records containing bettors names, addresses, limits of bets and a code name Moody on 3 x 5 cards. Upon interviewing one of the bettors he stated he had bet with a bookmaker, did have a limit, which corresponded with the limit on the 3 x 5 cards and paid or rec'd money from Joe Nadell who had a code name of Moody.

"Your affiant upon interviewing this bettor gave no indication that your affiant had evidence of the limits of his bets and the code name of Moody for Nadell.

"All of the above happened within the last three years."

Defendant's argument is that the affidavit in support of the search warrant fails to establish sufficient probable cause to search defendant or his home.

## I

■ Defendant first argues that "a search warrant designating more than one person or place to be searched, must contain sufficient probable cause to justify its issuance as to each person or place named therein," and its established sufficiency as to the other defendants is not necessarily enough to show its sufficiency as to defendant. We agree. ■ In determining the sufficiency of evidence for issuance of a search warrant, the test of probable cause is the same as that applicable to an arrest without a warrant. The facts must be such that it would lead a man of ordinary caution or prudence to believe and consciously entertain strong suspicions of the guilt of the accused. (*People* v. *Stout* (1967) 66 Cal.2d 184 [57 Cal.Rptr. 152, 424 P.2d 704]; *Williams* v. *Justice Court* (1964) 230 Cal.App.2d 87 [40 Cal.Rptr. 724].) It therefore follows that the affidavit in support of a search warrant must state sufficient facts so that a man of ordinary caution or prudence would entertain a strong suspicion of the guilt of *each* accused, and the fact that the warrant may state sufficient facts to support a search of the other accused persons is not necessarily sufficient as to the instant defendant. Therefore, despite the plethora of information implicating Kahn and others, it remains for us to examine the affidavit as it relates to defendant Nadell.

The case of *Aguilar* v. *Texas* (1964) 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509], sets forth a two-pronged test for determining the sufficiency of the affidavit. This test as interpreted by the California courts states that the affidavit must allege both: (1) the informant's statement in language that is factual rather than conclusionary and must establish that the informant spoke with personal knowledge of the matter contained in such statement; and (2) the affidavit must contain some underlying factual information from which the magistrate issuing the warrant can reasonably conclude that the informant was credible or his information reliable. (*People* v. *Hamilton* (1969) 71 Cal.2d 176, 179-180 [77 Cal.Rptr. 785, 454 P.2d 681]; *People* v. *Tillman* (1965) 238 Cal.App.2d 134, 137-138 [47 Cal.Rptr. 614].) Defendant concedes the reliability of the informants and only challenges the first "prong" of the two-pronged test.

■ Defendant argues that certain information against Nadell was not based on informant #2's own personal knowledge but was relayed to

the informant #2 by a third party, and therefore the information may not be used to sustain the affidavit. Informant #2 told the affiant that he received information from a close associate of Rudy Antonelli and Joe Nadell that Joe Nadell had recently gone to Rudy Antonelli's to make a deal.[1] Defendant argues that this information may not be used to sustain the affidavit because it is not within the informant's personal knowledge.

Hearsay statements in themselves are insufficient to support an affidavit where the statements are not specific and factual enough to show the magistrate that the incriminating facts related by the informant were gained through personal knowledge rather than rumor. (*People* v. *Benjamin* (1969) 71 Cal.2d 296, 301 [78 Cal.Rptr. 510, 455 P.2d 438]; see *People* v. *Scoma* (1969) 71 Cal.2d 332 [78 Cal.Rptr. 491, 455 P.2d 419].) However, hearsay upon hearsay need not be totally disregarded. In *People* v. *Scott* (1968) 259 Cal.App.2d 268, 278-279 [66 Cal.Rptr. 257], the court found that, where an informant's hearsay statement is conveyed to the affiant through further hearsay, this in itself does not constitute probable cause, but the statements may be considered as part of the total picture presented to the magistrate. The *Scott* court found that the diverse scraps of information, including the hearsay on hearsay, if taken as a whole, may be sufficient. Therefore, under the rule of the *Scott* case, we need not disregard the information supplied by informant #2 which he had learned from a close associate of Antonelli and defendant, although this information in itself cannot constitute probable cause.

It is also alleged that certain other information quoted below, implicating Nadell was hearsay on hearsay: "[Y]our affiant (received information from) a confidential reliable informant, hereinafter designated as Informant #1, that a person known as 'Steve' was engaging in bookmaking, and working as a back office clerk for a large bookmaking organization in Los Angeles. He said that the organization was comprised of a number of known bookmakers in Los Angeles County, including Fred Sica, Chris Patti, Boris Feldman, Al Glassman, Rudy Antonelli, Joe Nadell and Robert Benjamin. He said that 'Steve' had told him that he had been arrested once for bookmaking on an occasion when he was working a phone spot receiving wagers from bettors; that at that time he was working for a bookmaker known as Antone Kaleel, and at the time of his arrest he was in bed wearing only his shorts."

---

[1]"Informant #2 told your affiant that Joe Nadell had recently gone to Rudy Antonelli and made a deal to have Rudy Antonelli's bookmaking organization service or accept all of his bettors if Antonelli would pay off monies presently owing the bettors from a defunct bookmaking organization and that Antonelli agreed. This information was related to Informant #2, according to him, by a close associate of Rudy Antonelli and Joe Nadell."

Our reading of this language does not necessarily indicate that the information concerning Joe Nadell was given to informant #2 by Steve, as defendant claims. Nevertheless, informant #2 does not indicate that this information was within his personal knowledge, a requirement set forth by the *Aguilar* test, and unless we can infer informant #2's personal knowledge from a detailed description of the accused's activity (see *Spinelli* v. *United States* (1969) 393 U.S. 410 [21 L.Ed.2d 637, 89 S.Ct. 584]) (a matter we will discuss in detail later), this statement lends little in the way of corroborative support to the total picture.

Informant #2 also related the following information which forms part of our total picture: "Informant #2 told your affiant that Kahn is known to him to be the coordinator and back office clerk for a large Los Angeles bookmaking organization and that Kahn spends a lot of time going around town settling disputes between bettors and bookmakers and conducting financial transactions. He stated that bookmakers Fred Sica, Chris Patti, Al Glassman, Joe Nadell, and Rudy Antonelli use Kahn's services and that Kahn is paid by them to coordinate their bookmaking activities and either bring them money or get money from them to either pay to or collect from bettors."

Although it is clear from the above that informant #2 had personal knowledge of Kahn's bookmaking activities, there is no statement here definitely indicating that informant #2 had personal knowledge of defendant's involvement in bookmaking, and once again, unless we have some reason to infer the informant's personal knowledge of defendant's activity, this information would be insufficient to sustain the affidavit.

After examining the affidavit we find we cannot infer informant #2's personal knowledge of Nadell's activities. In *People* v. *Hamilton* (1969) *supra*, 71 Cal.2d 176, 181, it was alleged that the criminal activity was described in sufficient detail to permit the inference that the informant had personal knowledge of the events which transpired. The Supreme Court said: "While we do not reject the possibility that an informant who fails to provide factual allegations of his own experience might nevertheless provide a description of the contraband itself or its particular location so detailed as to warrant the inference of personal observation, we do not believe that the description here in question is sufficient for that purpose. In the *Spinelli* case it was urged that the facts provided by the informant, and especially the specific telephone numbers given by him, were sufficient to show 'that the informer had gained his information in a reliable way.' The court rejected this argument: 'This meager report could easily have been obtained from an offhand remark heard at a neighborhood bar.' (393

U.S. at p. 417 [21 L.Ed.2d at p. 644].) Similarly in the instant case the informant could have obtained his information as to the amount of dangerous drugs involved and the way in which it was packaged from an unreliable source. In order to infer in the absence of direct factual allegations that the informant had personal knowledge of the incriminating facts related by him we must insist upon more significant detail than is present in the instant affidavit."

█ In the instant case, in the affidavit, there is no showing of personal knowledge of Nadell's activities, and no detail from which an inference of personal knowledge of his activities can be made. Although there is much detailed description of bookmaking activities in the typewritten part of the affidavit, the specific information relates to Kahn and to other persons but not to defendant Nadell.

█ In reviewing an affidavit based on hearsay the reviewing court must use common sense rather than a hypertechnical approach in applying the two-pronged test requiring the affidavit to contain sufficient facts to support the informant's personal knowledge and sufficient facts to support his credibility, but the court may not supply factual information in the guise of interpretation. (*People* v. *Scoma* (1969) *supra*, 71 Cal.2d 332, 336.) Here we cannot supply facts to show personal knowledge of Nadell's activity from the mere fact that the informant had personal knowledge of Kahn's activities and the activities of others.

Defendant alleges that the handwritten addition to the affidavit, while implicating defendant generally in prior bookmaking activity, relates to facts too remote in time to lend support to the affidavit. We agree. The final sentence of the handwritten page states that "all of the above happened within the last three years." █ " '[P]roof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time.' " (*People* v. *Sheridan* (1969) 2 Cal.App.3d 483, 490 [82 Cal.Rptr. 695].)

█ The People argue that staleness is irrelevant because the information in the handwritten affidavit was corroborative only. Even assuming that the People are correct that information that is merely corroborative may be remote in time, nevertheless this does not aid their cause. There is no other information before us which can corroborate stale information because, as we have said before, there was no showing that any of the other information concerning Nadell was within the informant's personal knowledge. Since the handwritten part of the affidavit fails because of staleness, we need not examine defendant's other objections to the handwritten part of the affidavit.

Examining the total bits of information against Nadell as we are bound to do (*People* v. *Scott* (1968) *supra,* 259 Cal.App.2d 268, 278), the gestalt does not strongly suggest Nadell's involvement, but amounts to little more than rumor or gossip. Also, all information derived by police surveillance heavily implicates Kahn and others but not Nadell. Although Kahn had made brief stops at Nadell's house, there was no showing of criminal activity therein.

To summarize: The handwritten affidavit proves no more than that, on one occasion (inferentially three years before), there was reliable information that this defendant was engaged in bookmaking. We *know* nothing of his more recent activities except that he still carries on an acquaintanceship with Kahn and other bookmakers (the nature of that relationship being unexplained), and that street gossip implicates him in current bookmaking activity. That kind of information is not sufficient.

The appeal from the order is dismissed; the judgment (order granting probation) is reversed.

Files, P. J., and Dunn, J., concurred.