[No. B212061. Second Dist., Div. Six. July 28, 2009.]

THE PEOPLE, Plaintiff and Appellant, v.
DEREK HIRATA, Defendant and Respondent.

## COUNSEL

Gerald T. Shea, District Attorney, and Cheryll Manley, Deputy District Attorney, for Plaintiff and Appellant.

Sanger & Swysen, Robert M. Sanger and Stephen K. Dunkle for Defendant and Respondent.

OPINION

**GILBERT, P. J.**—"September Song" laments, "Oh, it's a long, long while from May to December." June 14 to September 4 is a shorter while. But here it is too long a while.

In an affidavit in support of a search warrant, June 14 is the date that criminal activity is alleged to have occurred. September 4 is the date the search warrant issued. Here we conclude the warrant fails the test of time, and the good faith exception to the exclusionary rule does not apply.

The trial court quashed the search warrant because the information contained in the supporting affidavit was stale. It dismissed the case when the People were unable to proceed. The People now appeal. We affirm.

## FACTS

On September 4, 2007, police obtained a warrant to search 13 homes and businesses for methamphetamine, cocaine, other controlled substances, drug paraphernalia, cash, and financial records. Derek Hirata's home was one of the 13 buildings that police were authorized to search. The warrant also authorized police to search nine vehicles and 13 individuals.

In a 53-page supporting affidavit, Police Officer Chad Pfarr stated that he conducted a nine-month investigation of a drug trafficking organization run by Raymond Carper, Ruben Jimenez and Jesus Del Rio. In the affidavit, he described numerous sales of illegal controlled substances the organization made to many buyers.

During the investigation, police monitored phone calls between Carper, Jimenez and others. Between May 28 and June 14, 2007, Carper and Jimenez discussed a transaction involving the sale of $7,000 worth of drugs. In a call on May 28, Jimenez asked Carper to have Hirata "deposit $7,000 in cash into JIMENEZ['s] bank account in exchange for 'a half libra' (1/2 pound)." Jimenez said that "he'll 'work a deal with [Hirata]' and that '[t]he parts (cocaine) are two hours away.' " In a later call that day, Jimenez said that for $7,000 he would deliver a half-pound of methamphetamine and "it'll be the bomb, I'll give his money back if not good stuff." In a subsequent conversation, Carper told Jimenez that he had spoken with Hirata who said that "he'll shoot by the bank and do it."

On June 12, 2007, Hirata called Jimenez to find out when Jimenez would arrive in San Luis Obispo County. In a June 14 call, Jimenez asked Hirata to come to Jimenez's home so "[t]hat way we can take care of it right there."

Pfarr believed that Hirata and Jimenez met to complete the sale on that date. Thereafter, Hirata is not mentioned in the warrant affidavit.

The affidavit discusses numerous drug transactions, arrests, and communications involving Carper, Jimenez, Del Rio and others in July and August of 2007. In July, police began a surveillance of Carper's house. On July 10, police arrested Johnny Odom after he went there to purchase methamphetamine. In August, police conducted a surveillance of Del Rio's home and learned that he was dissatisfied with drugs he bought from a supplier known as "Cunado." On August 17, police arrested Del Rio's supplier for possession of 466 grams of cocaine. The affidavit contains no facts that show after June 14 there was surveillance directed at Hirata or his house, or any evidence of drug trafficking there.

On September 6, the police executed a search warrant at Hirata's home and seized, among other things, methamphetamine and other controlled substances.

The prosecutor filed a criminal complaint alleging that Hirata and 10 others had conspired to possess methamphetamine for sale (Health & Saf. Code, § 11378); transport or sell methamphetamine (*id.*, § 11379); possess cocaine for sale (*id.*, § 11351); and transport or sell cocaine (*id.*, § 11352).

Hirata filed a motion to quash the search warrant and suppress the evidence seized from his home. He claimed the search warrant was based on stale information about a drug sale that occurred on June 14, 2007, and that Pfarr did not show that "anything would still be located at [his] residence . . . on September 4, 2007." Hirata did not contest the evidence that he made numerous phone calls to Carper between 2006 and February of 2007, and did not challenge evidence of many drug sales by Carper's organization to others. But he claimed the nine-month investigation documented his involvement in only one transaction, the June 14 purchase at Jimenez's house.

The prosecutor responded that the warrant authorized the search of 13 individuals, including Hirata, who were involved in a conspiracy to sell and transport drugs. She claimed the June 14 information about Hirata was not stale because there was an "ongoing criminal conspiracy from June 15 to September 4," but, if it were stale, the case fell within the good faith exception to the exclusionary rule.

The trial court granted the motion to quash and to suppress the evidence. The trial judge, who was also the magistrate who issued the warrant, said, "[T]he warrant, as to Mr. Hirata, was improperly granted. I think that the information would certainly have been stale by the time the warrant was

executed. I considered the People's theory of on-going criminal conspiracy. But, as it relates to Mr. Hirata, I don't believe there's any evidence of that from June 15th through September 4th . . . ."

On August 8, 2008, the court dismissed the case after finding that the prosecution was "unable to proceed." The People appeal.

## DISCUSSION

### 1. Stale Information

"The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." (*People v. Glaser* (1995) 11 Cal.4th 354, 362 [45 Cal.Rptr.2d 425, 902 P.2d 729].)

 "Probable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " (*United States v. Grubbs* (2006) 547 U.S. 90, 95 [164 L.Ed.2d 195, 126 S.Ct. 1494].) "[T]he probable-cause requirement looks to whether evidence will be found *when the search is conducted* . . . ." (*Ibid.*)

 Stale information in a search warrant affidavit does not establish present probable cause for a search. (*People v. Hulland* (2003) 110 Cal.App.4th 1646, 1652 [2 Cal.Rptr.3d 919].) "Although there is no bright line rule indicating when information becomes stale . . . , delays of more than four weeks are generally considered insufficient to demonstrate present probable cause." (*Ibid.*, citation omitted.) In *Hulland*, we stated that "a delay of 34 days between a controlled sale of heroin and the officer's affidavit for the search warrant has been held insufficient to establish present probable cause." (*Ibid.*)

Here the trial court reasonably found that the affidavit information was stale. Pfarr said that on June 14, Hirata completed a drug transaction. But the police did not seek a warrant to search Hirata's home until September 4, 2007. The delay between the June 14 transaction and the issuance of the warrant is 82 days. Consequently, there was no current information to establish present probable cause. (*People v. Hulland, supra*, 110 Cal.App.4th at p. 1652.)

The People contend the trial court ignored exceptions to the staleness doctrine. Delays beyond four weeks may be justified where there is a

reasonable inference that the defendant's actions "will continue until the time of the search." (*People v. Hulland, supra*, 110 Cal.App.4th at p. 1652.) But here the affidavit contains no facts showing that between June 15 and September 4, there were any drug sales at Hirata's house or that he engaged in such transactions.

■ Moreover, the affidavit does not indicate whether the drugs involved in the June 14 transaction were at Hirata's home or remained there. "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." (*Zurcher v. Stanford Daily* (1978) 436 U.S. 547, 556 [56 L.Ed.2d 525, 98 S.Ct. 1970].) But even had the affidavit stated that the drugs were at Hirata's home on June 14, the "affidavit in support of a search warrant must provide probable cause to believe *the material to be seized is still on the premises to be searched when the warrant is sought.*" (Italics added.) (*People v. Mesa* (1975) 14 Cal.3d 466, 470 [121 Cal.Rptr. 473, 535 P.2d 337].) The affidavit here does not comply with *Mesa*.

The People contend there was a continuing conspiracy involving Hirata to sell drugs during the period leading up to the search. The trial judge perceptively noted, "I considered the People's theory of on-going criminal conspiracy. *But, as it relates to Mr. Hirata, I don't believe there's any evidence of that from June 15th through September 4th . . . .*" (Italics added.) The affidavit's description of drug transactions in July and August involved suspects other than Hirata.

The People suggest that Hirata was a major part of the organization responsible for ongoing drug transactions. That may be true, but where the facts yield conflicting inferences, we defer to the implied findings of the trial court. (*People v. Glaser, supra*, 11 Cal.4th at p. 362.) The affidavit describes the group responsible for the continuing drug sales as "JIMENEZ/CARPER/DELRIO Drug Trafficking Organization," without reference to Hirata. The affidavit primarily recounts the continuing activities of these three individuals. A small portion of the affidavit concerns Hirata. Hirata obviously knew Carper and had made numerous phone calls to him from 2006 to February of 2007. But the court could draw more than one inference from this. (*U.S. v. Algie* (6th Cir. 1983) 721 F.2d 1039, 1042–1043 [number of daily phone calls from a gambling operation to a business was suspicious but not probable cause for a search warrant].) The phone calls involving Hirata ended six months before the search. The subject matter of these calls is not described in the portion of the affidavit that mentions "high

volume of calls." Moreover, deference to the trial court's reasonable inferences is appropriate because the trial judge knew about these phone calls. She issued the orders authorizing certain wiretaps during Pfarr's investigation.

The nine-month investigation yielded detailed information about many drug transactions. The People suggest that the trial court may not adopt Hirata's claim that he was only involved in one transaction given the multiple contacts he had with Carper. The affidavit does not specify the number of drug transactions involving Hirata. And the People have not shown why the trial judge, who was also the magistrate who issued the warrant, could not reasonably infer that only the June 14 drug transaction is sufficiently described.

■ No evidence links Hirata to the transactions involved in Odom's or Cunado's arrests. The affidavit describes arrests of persons who bought drugs from the organization at homes and documents movement of drugs to a commercial establishment. But the affidavit reflects that the business entity mentioned was connected to Del Rio and the homes belonged to Jimenez and Carper. In February and March, police used a confidential informant to make drug purchases. But the affidavit reflects that those transactions involved Carper, not Hirata. Pfarr often relies on his expert opinion to link suspects to transactions. The experienced officer's opinions are entitled to great deference, but the magistrate must determine whether the factual links are adequately connected to each defendant. (*People v. Nadell* (1972) 23 Cal.App.3d 746, 752 [100 Cal.Rptr. 444].)

■ The affiant's opinion that the defendant is a criminal, or that he or she previously bought drugs elsewhere, does not require the magistrate to infer that the remaining factual prerequisites for a current search of the defendant's home are established. (*People v. Hulland, supra,* 110 Cal.App.4th at pp. 1652–1653; *U.S. v. Frazier* (6th Cir. 2005) 423 F.3d 526, 533; *U.S. v. Freeman* (5th Cir. 1982) 685 F.2d 942, 951; *U.S. v. Gramlich* (5th Cir. 1977) 551 F.2d 1359; *U.S. v. Bailey* (9th Cir. 1972) 458 F.2d 408, 412.) " '[S]imply from the existence of probable cause to believe a suspect guilty, [it does not follow in all cases] that there is also probable cause to search his residence.' " (*Bailey,* at p. 412.) Even had Pfarr sought a search warrant on June 14, a magistrate could reasonably infer that the most relevant fresh link would still be to the place where Pfarr said the drugs were stored, sold, and where the transaction with Hirata took place, namely Jimenez's home. (*U.S. v. Freeman, supra,* 685 F.2d at p. 951; *U.S. v. Gramlich, supra,* 551 F.2d at p. 1362.)

Relying on *People v. Mikesell* (1996) 46 Cal.App.4th 1711 [54 Cal.Rptr.2d 708], *People v. Medina* (1985) 165 Cal.App.3d 11 [211 Cal.Rptr. 216], and *People v. Cletcher* (1982) 132 Cal.App.3d 878 [183 Cal.Rptr. 480], the

People argue that evidence of past drug activity is not stale if there is an ongoing criminal investigation. But these cases are distinguishable.

In *Mikesell*, there were facts about past drug dealing by the defendants. But, unlike here, the affiant also stated facts about "recent heavy traffic" at the residence to update the older information and justify the search. (*People v. Mikesell, supra*, 46 Cal.App.4th at p. 1717.)

In *Medina*, the defendant claimed a search of a home was based on stale information because the affiant mentioned some drug transactions that had occurred one or two months earlier. The Court of Appeal rejected this claim. It noted that the police overcame staleness by documenting 20 to 30 drug transactions at that house within the prior two-month period and stating facts showing that these transactions continued at that residence "up to the time of the issuance of the warrant." (*People v. Medina, supra*, 165 Cal.App.3d at p. 20.) Pfarr made no such showing.

In *Cletcher*, police conducted a lengthy investigation of a defendant about a theft of art that had occurred two years earlier. But when they sought a search warrant, they obtained fresh information from a witness, one day before the search, that pinpointed the exact location of the stolen item in the place to be searched.

■ In opposing the suppression motion, the prosecutor said the investigation was successful and led to the arrests of other defendants and the search of other residences. But the issue here is probable cause to search Hirata's home. "This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another . . . ." (*Ybarra v. Illinois* (1979) 444 U.S. 85, 91 [62 L.Ed.2d 238, 100 S.Ct. 338].) " '[A] search warrant designating more than one person or place to be searched, must contain sufficient probable cause to justify its issuance as to each person or place named therein . . . .' " (*People v. Nadell, supra*, 23 Cal.App.3d at p. 752.) Consequently, "[I]n the case of multi-location search warrants [as here], the magistrate must be careful to evaluate each location separately." (*Greenstreet v. County of San Bernardino* (9th Cir. 1994) 41 F.3d 1306, 1309.)

■ The trial court reasonably found that Pfarr did not set forth facts linking the June 14 incident to the September 6 search. (*Zurcher v. Stanford Daily, supra*, 436 U.S. at p. 556; *People v. Mesa, supra*, 14 Cal.3d at p. 470; see also *U.S. v. Frazier, supra*, 423 F.3d at p. 533; *U.S. v. McNeal* (S.D.Ind. 2000) 82 F.Supp.2d 945, 960.) Pfarr's information was insufficient because

there was an absence of " 'facts *so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time.*' " (*Alexander v. Superior Court* (1973) 9 Cal.3d 387, 393 [107 Cal.Rptr. 483, 508 P.2d 1131], italics added.)

## 2. *The Good Faith Exception—Not Here*

The People claim the trial court erred by not ruling that this case falls within the good faith exception to the exclusionary rule. We disagree.

■ "This exception provides that evidence obtained in violation of the Fourth Amendment need not be suppressed where the officer executing the warrant did so in objectively reasonable reliance on the warrant's authority. The test for determining whether the exception applies is 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.' " (*People v. Hulland, supra,* 110 Cal.App.4th at p. 1653.) A better way to explain the test for the exception is to simply say it does not apply if the reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization. (*U.S. v. Leon* (1984) 468 U.S. 897 [82 L.Ed.2d 677, 104 S.Ct. 3405].)

But it is not objectively reasonable for officers to believe that a search is legal where there are long, unexplained delays between the search and the drug incident mentioned in the affidavit. (*People v. Hulland, supra,* 110 Cal.App.4th at p. 1655.) Here no facts show there had been drug transactions committed by Hirata, or others at his house, during the period between June 15 and September 4. "[T]he prosecution has the burden of proving that the officer's reliance on the warrant was objectively reasonable." (*Id.* at pp. 1654–1655.) This burden is not satisfied in a case involving a long delay by simply showing that the police had a "hunch" that drugs might be at a defendant's residence several months after a transaction involving the defendant. (*Id.* at p. 1655.)

■ The trial court implicitly and correctly determined that the good faith exception did not apply. " 'Good faith is not a magic lamp for police officers to rub whenever they find themselves in trouble.' " (*People v. Hulland, supra,* 110 Cal.App.4th at p. 1656.) "A reasonably well-trained officer would have recognized that probable cause in this case had grown stale by the time the warrant was sought and executed. To prevent the exception from swallowing the rule, application of the good faith exception must be limited in this context to those cases in which the staleness determination is a close one. This is not such a case." (*Id.* at p. 1657.)

We have reviewed the People's remaining contentions and conclude that they have not shown reversible error.

The judgment is affirmed.

Coffee, J., and Perren, J., concurred.