Filed 7/14/14  P. v. Abreu CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B251322 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA363746) |
| v. | |
| FREDERICO AUGUSTO ABREU, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court for the County of Los Angeles. Norman Shapiro, Judge.  Affirmed.

Robert A. Schwartz for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Erika D. Jackson, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## SUMMARY

Defendant Frederico Augusto Abreu appeals from the denial of his motion to suppress evidence. We find no merit in his contentions and affirm the judgment.

## FACTS

After unsuccessful attempts to quash a search warrant and to suppress evidence, defendant pled no contest to four felony counts in an open plea to the court: possession for sale of methamphetamine (Health & Saf. Code, § 11378); possession for sale of gamma-hydroxybutyrate (GHB) (Health & Saf. Code, § 11351); possession of clonazepam (Health & Saf. Code, § 11377); and having a counterfeit seal (a counterfeit California driver's license) (Pen. Code, § 472). The court placed defendant on three years formal probation with various terms and conditions, and made other orders not at issue in this appeal.

During the proceedings below, defendant filed a motion to quash a search warrant that covered two different locations: 1280 North Laurel Avenue, no. 7 (the Laurel apartment), and 1210 North Cherokee Avenue, no. 120 (the Cherokee apartment). The recovery of narcotics and other evidence at the Cherokee apartment provided the basis for the charges against defendant. The motion to quash was denied.

A few months later, defendant moved to suppress all the evidence acquired from a warrantless vehicle search, incident to defendant's arrest, that preceded issuance of the search warrant for the Laurel and Cherokee apartments (and upon which the search warrant was partially based). Defendant contended his former counsel neglected to challenge the warrantless seizure of evidence from the vehicle search, without which there was no probable cause to search the Cherokee apartment. The evidence presented at the suppression hearing in July 2012 revealed the following facts.

In September 2009, Bernadette Gambino was a detective assigned to investigate sales of narcotics in West Hollywood. She testified that on September 2, 2009, she received information that defendant was involved in the trafficking and sale of narcotics. She learned defendant was a wanted fugitive in Florida for trafficking of methamphetamine, and a citizen informant told her of sales of narcotics in the building

where defendant (and the informant) lived (the Laurel Avenue location). The informant told the detective there were sales of narcotics from three apartments (nos. 2, 7, and 6). The informant said defendant lived in Apartment 6, and went in and out of Apartment 7. The informant had witnessed several "hand-to-hand drug transactions" between individuals from Apartment 2 and Apartment 7, and "identif[ied] [defendant] as one of the individuals involved in the narcotics transaction." Detective Gambino learned that an individual named Franklin Dunham lived in Apartment 7, and the informant told her that defendant "had been living in Apartment Number 6 but that approximately one to two weeks prior, he had been staying with [Mr. Dunham] in Apartment Number 7." When cross-examined, Detective Gambino said she "[didn't] remember if it [the information from the informant about hand-to-hand transactions] was before September 2nd . . . ."

Detective Gambino testified that, "within the first few weeks of September," she received the information about the Florida warrant for defendant. Detective Gambino advised the citizen informant to let the police know immediately if the informant saw defendant. On September 27, 2009, the informant called and said he or she had seen defendant in the courtyard of the Laurel Avenue apartment complex wearing a blond wig and a baseball hat. On September 29, 2009, the detective contacted the Broward County Sheriff's Department, and confirmed a warrant for defendant was still outstanding.

On September 29, 2009, Detective Gambino and her partner were in separate cars conducting undercover surveillance of the Laurel Avenue location. Detective Gambino's partner observed defendant and another man, later identified as Mr. Dunham, loading items into a maroon-colored Kia. Detective Gambino then approached on foot and saw defendant standing next to the passenger door of the Kia, "and I identified that it was him" based on pictures of defendant she had previously obtained. Mr. Dunham was in the driver's seat of the car, getting ready to drive off.

When she saw defendant, "he had attempted to get in the car. . . . I think his kind of butt was sitting on the seat with his feet still at the curb, or on the cement, and I kind of grabbed him and had him get out of the car." (At this time, Detective Gambino was

3

alone; her partner "didn't arrive until [defendant] was already on the ground" (as described, *post*).)

Defendant "became very agitated and hysterical" when Detective Gambino ordered him to step out of the vehicle. The detective asked defendant his name, and he said his name was Henrique and his identification was in Apartment 7. Detective Gambino testified: "He kept arguing with me. I put my hand on his wrist. I had him – he was seated with his feet on the curb. I had him get out of the car. I turned him toward the car. He was struggling with me. He kept wanting to break free from my grasp and kept telling me he needed to go to Apartment 7 to get his I.D. When that didn't happen, he had his body get rigid, and he – he kind of – went limp but didn't go limp and was kind of jerking and shaking and laid his body in the curb. So I had my sergeant called paramedics in the event that he was actually suffering a seizure." (The sergeant, who was "maybe a half a block away," arrived "[w]ithin a minute, maybe.")

When Detective Gambino grabbed defendant, "[h]e had – there was a wallet, and I had him put it down." She described it as "like a man purse," "large enough to contain a smaller wallet, but it wasn't like a full-on bag." The prosecutor asked Detective Gambino where the bag was when she initially arrested defendant, and the detective replied: "I don't remember if it was right there on the passenger seat or in his hand or on the passenger floorboard. I think he had it in his hand when he entered the car, but I can't be sure. I don't remember. It was 2009." Detective Gambino said, "I got [defendant's] bag [the "man purse"] at the time that he was in the gutter to get his I.D., which was – it was either on the passenger's seat or the floorboard." When she retrieved the man purse, she did not know what was in it, and "retrieved the bag to take a look at it . . . ." She had the bag before the paramedics arrived. When the paramedics arrived, defendant was "laying in the gutter," "[r]ight next to the car," "[k]ind of on his side." He was not handcuffed.

Detective Gambino searched the bag and found a wallet with a California driver's license, a pill container with methamphetamine in it, and an iPhone.

The other individual identified himself as Franklin Dunham, and cooperated with the police. He told Detective Gambino the car was a rental car and he had rented it. After she searched defendant's "man purse" and found methamphetamine, Detective Gambino asked Mr. Dunham if she was "going to find anymore methamphetamine in the car," and he replied, "I hope not." Then Detective Gambino directed other officers who had arrived to search the vehicle while she "maintained visual of [defendant] being treated by the paramedics." (The search of the car "was done while the paramedics or prior to the paramedics getting there. It was all done simultaneously.") The officers who searched the car found a case with a blond wig in the back seat, and they found a black toiletry bag containing methamphetamine and syringes in the trunk. Mr. Dunham acknowledged that the toiletry bag belonged to him. Mr. Dunham was arrested.

The paramedics transported defendant to a hospital, and after a determination there was no medical emergency, police took him to the West Hollywood sheriff's station, where he was booked. Detective Gambino advised Florida authorities that defendant was in custody, "and they were to send me an extradition order . . . ." Then she interviewed defendant, who waived his *Miranda* rights. (*Miranda v. Arizona* (1966) 384 U.S. 436.)

Defendant told Detective Gambino he left Florida because he was about to be arrested and did not want to go to jail. He was living in Apartment 6 at 1280 North Laurel originally. Then, sometime before August 26, 2009, he rented the Cherokee apartment, but he stayed with Mr. Dunham three or four nights a week because he was allergic to the carpet in the Cherokee apartment.

Detective Gambino had possession of defendant's cell phone from the time she arrested defendant and throughout the interview. The phone was on. During that time, "there were several text messages that would come in, and it wasn't like I had to access the phone. It was – just appeared." "In plain view, I was able to read it." One of the texts said, "Hey, handsome, I want a hundred vitamins and a gallon of water." Based on her training and experience as a narcotics detective, this was slang; "a gallon of water could be liquid meth, or it could be G.H.B. or 1, 4-butanediol, depending on the grade it was. The vitamins could be any type of narcotic, could be ecstasy, could be Xanax, could

5

be – whatever slang he used for whatever the vitamins are." The detective did not remember how many similar text messages came in, but "[i]t was throughout the night."

Detective Gambino then applied for a search warrant for the Laurel apartment (Mr. Dunham's apartment) and the Cherokee apartment (where defendant told her he was residing). At the Cherokee apartment, police recovered, in addition to narcotics, a fraudulent California driver's license (with Mr. Dunham's name and defendant's photograph), as well as a gas company bill and a water and power bill in Mr. Dunham's name for the Cherokee apartment. (When Detective Gambino confronted Mr. Dunham with this information, he told her he had no knowledge the Cherokee apartment was in his name.)

Defendant testified. He said that the "man purse" was a computer bag containing his laptop computer, two phones, his wallet and a pill bottle with prescription medication for heartburn. The bag was in the backseat of the car. Defendant said he did not live at the Cherokee apartment; he was helping Mr. Dunham to move there; and he denied telling the detective that he rented the Cherokee apartment but often stayed with Mr. Dunham. Defendant acknowledged he had been staying at the Cherokee location periodically, but insisted it was Mr. Dunham's apartment.

The trial court denied defendant's motion to suppress, observing that "it's a close case." "If this was strictly and simply strictly a *Gant* issue [(*Arizona v. Gant* (2009) 556 U.S. 332 (*Gant*))], it would be the court's feeling that the officer perhaps would not be justified in going into that man bag, man purse, without a warrant. But I think, under the circumstances of this case, that the sergeant was justified in retrieving that, under the circumstances." Those circumstances were that defendant was "in close proximity to the vehicle, in the gutter, not secured," and in addition defendant, the court observed, was "significantly larger than" Detective Gambino and "could have easily overpowered the [detective], . . . and, in fact, retrieve the bag."

Defendant filed a timely appeal of the trial court's order.

## DISCUSSION

In reviewing a ruling on a motion to suppress, we defer to the trial court's factual findings where supported by substantial evidence, and exercise our independent judgment in determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment. (*People v. Hirata* (2009) 175 Cal.App.4th 1499, 1504 (*Hirata*).)

Defendant contends (1) there was no probable cause justifying the search warrant for the Cherokee apartment; (2) the information tending to establish that defendant was involved in narcotics transactions was stale; and (3) the warrantless seizure of the items in defendant's "man purse" was illegal under *Gant*, *supra*, 556 U.S. 332, and without that information in the search warrant, "there was no present probable cause to revive otherwise stale information." None of these contentions has merit.

First, there was probable cause for the search of the Cherokee apartment.

"The question facing a reviewing court asked to determine whether probable cause supported the issuance of the warrant is whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing. [Citations.] 'The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1040-1041 (*Kraft*).)

Here, the citizen informant described Apartments 2, 6 and 7 at the Laurel Avenue location as having constant foot traffic between the hours of 10:00 p.m. and 2:00 a.m.; identified the occupants of those apartments, including defendant; and also witnessed several "hand-to-hand drug transactions" between individuals in Apartment 2 and Apartment 7. The informant told Detective Gambino that defendant had moved from Apartment 6 one or two weeks earlier and was staying with Mr. Dunham in Apartment 7. The detective knew that defendant was a fugitive wanted in Florida for narcotics trafficking. After his arrest, defendant told the detective he rented the Cherokee

7

apartment. And, while interrogating defendant, Detective Gambino observed text messages, in plain view on defendant's cell phone, one of them saying, "Hey, handsome, I want a hundred vitamins and a gallon of water," which the detective knew to be slang for various types of narcotics. Certainly these circumstances showed a "fair probability" (*Kraft, supra,* 23 Cal.4th at p. 1041) that evidence of narcotics trafficking would be found at the Cherokee apartment defendant told Detective Gambino he had rented.

Second, we do not agree that the informant's information, tending to establish that defendant was involved in narcotics transactions at the Laurel Avenue location, was "stale." The search warrant affidavit was executed September 30, 2009, and states that on September 2, 2009, the detective learned defendant was wanted in Florida, and that his last known address was Apartment 6 at the Laurel Avenue location. The affidavit further states that "[d]uring the last several weeks," police had received several complaints from the citizen informant about drug sales at the Laurel Avenue location; and that on September 27, the citizen informant contacted police to tell them defendant was seen in the courtyard of the Laurel Avenue location wearing a blond wig and a baseball cap. The detective then confirmed the Florida warrant was active and set up the undercover surveillance operation to take defendant into custody.

Defendant asserts that the informant's description of the drug transactions at the Laurel complex "was about five weeks old" when the search warrant was issued, so it was "stale" and could not furnish probable cause, citing *Hirata*, *supra*, 175 Cal.App.4th at page 1504 (82-day delay between a drug transaction and issuance of search warrant); *People v. Hulland* (2003) 110 Cal.App.4th 1646, 1648, 1652 (*Hulland*) (52-day delay between controlled drug buy and issuance of search warrant; while there is no bright line rule, "delays of more than four weeks are generally considered insufficient to demonstrate present probable cause"); and *Hemler v. Superior Court* (1975) 44 Cal.App.3d 430, 432-433 (delay of 34 days between a controlled sale of cocaine and the officer's affidavit for a search warrant).

The facts do not support defendant's claim, and neither do the authorities cited. The affidavit does not, as defendant suggests, state that the informant witnessed the drug

8

sales several weeks before September 2, 2009; it clearly states the information was received "[d]uring the last several weeks," and refers to "several complaints" from the citizen informant. Further, the cases defendant cites involve specific drug transactions as the basis for the warrant, followed by inexplicable delays in seeking the warrant. This is not such a case. (See *Hulland, supra,* 110 Cal.App.4th at p. 1652 ["[t]he question of staleness turns on the facts of each particular case"; "[i]f circumstances would justify a person of ordinary prudence to conclude that an activity had continued to the present time, then the passage of time will not render the information stale"].)

Third, we also reject the claim that the warrantless seizure of defendant's man purse was illegal under *Gant.* In that case, the court held: "Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest. When these justifications are absent, a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies." (*Gant, supra,* 556 U.S. at p. 351.)

Here, the trial court found defendant was "in close proximity to the vehicle, in the gutter, not secured," and "could have easily overpowered the [detective] . . . ." Substantial evidence supported these findings. The court observed both Detective Gambino and defendant, and Detective Gambino testified that she retrieved the man purse before the paramedics arrived, and defendant was "laying in the gutter," "[r]ight next to the car," "[k]ind of on his side," and was not handcuffed. Since defendant was "within reaching distance of the passenger compartment at the time of the search" (*Gant*, at p. 51) and was unsecured (indeed, the detective believed him to be feigning illness), the search of the man purse without a warrant was reasonable.

## DISPOSITION

The judgment is affirmed.

GRIMES, J.

We concur:

BIGELOW, P. J.        RUBIN, J.

9