Filed 12/30/14  P. v. Pantoja CA1/4
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>MIGUEL PANTOJA,<br><br>　　　　Defendant and Appellant. | A135667<br><br>(Solano County<br>Super. Ct. No. FCR 251135) |

　　　　Defendant Miguel Pantoja appeals a judgment entered upon a jury verdict finding him guilty of first degree murder, and finding true an allegation that he personally used a deadly and dangerous weapon.  He contends the trial court erred when it denied his motion to suppress evidence and when it refused his request for a pinpoint instruction on the defense theory that someone else committed the crime.  He also contends the evidence does not support the verdict.  We shall affirm the judgment.

## I.  BACKGROUND

### A.  The Killing

　　　　Defendant and the victim, Adriana Ortiz Pantoja, were married to each other, and divorced in late 2007.  They had lived separately since 2004.  Their daughter, Nancy, lived with Adriana in Suisun during that time, and defendant lived in Fairfield.[1]  Under the terms of the divorce, Adriana would be awarded the house and she would refinance it

---

[1] Because defendant, his former wife, and his daughter shared a last name, we shall refer to Adriana and Nancy by their first names.  We intend no disrespect.

1

to give defendant his share of the house's value, and Adriana would have custody of Nancy.

In December 2007, Nancy was spending the winter break with the pastors of the church she and Adriana attended, Monica and Arturo Sanchez. The day before Nancy was supposed to return to Suisun, Adriana was not in church, as she usually was on Sundays. Nancy tried unsuccessfully to contact her that day. The following morning, January 7, 2008, Nancy went with the Sanchezes to the house she shared with Adriana. The front door was locked. They opened the door and saw bloodstains on the living room carpet. Arturo Sanchez followed the stains toward the bathroom, went into the bathroom, and saw Adriana's body in the tub. The three of them left the house and called the police.

Police officers came to the scene. There was a large bloodstain in the living room, a trail of blood leading to the bathroom as if someone had been dragged, and a large amount of blood on the bathroom floor. A woman's body was in the tub. Her shirt was raised up as if from being dragged, and her pants were down toward her feet. Her neck had been cut deeply.

The furniture in the living room was in disarray, and the door of an entertainment center was broken. A knife set was missing from the kitchen counter.

## B. The Investigation

Detective William Lee of the City of Suisun Police Department spoke with Nancy, who gave him her father's cell phone number. Lee called defendant, who went to his home to meet Lee. Defendant was driving a pickup truck. Lee noticed that defendant had what appeared to be two fresh claw or fingernail scratches on the side of his face.

Lee looked inside defendant's truck and saw stains on the seat cushions. Lee used a screening test on a stain on the driver's seat, and it tested positive for blood. The stain was later found to contain female DNA that matched Adriana's profile. This profile would be shared by approximately one in 1.5 sextillion African-Americans, one in 2.6 sextillion Caucasians, and one in 750 quintillion Hispanics.

A criminalist scraped under Adriana's fingernails. A small piece of material under a fingernail on her right hand appeared to be skin and was found to have DNA that matched the profile for defendant's blood.[2] That profile would be found in approximately one in 26 quintillion African-Americans or Caucasians and one in 38 quintillion Hispanics. Defendant could not be excluded as the source of material found under Adriana's left fingernails that came from a male contributor.

An autopsy of Adriana showed a number of injuries to her neck, head, face, and shoulder, including cuts and scratches, stab wounds, and slash wounds. The injuries appeared to have been caused by a sharp instrument. Her death was caused by a large, deep slash wound to her neck that went through her throat, penetrated her cervical spine, and almost decapitated her. The slash severed her carotid arteries and jugular veins. Blood would have come from her body at high velocity in a "geyser like flow" and covered any part of the assailant's body that was in front of her. The irregularity of the wound suggested it had not been made in a continuous motion, but that the assailant had stopped and started several times. The direction of the slash wound, from Adriana's right to left, suggested her killer had used the left hand if he or she was standing behind Adriana.[3] Adriana also had bruises on her face, arms, hand, finger, and thigh. Based on the condition of her body, it appeared Adriana had probably been dead 24 to 36 hours before she was discovered.

No murder weapon was found in defendant's truck or residence.

**C. Defendant's Prior Actions and Threats**

Defendant had moved out of the family home in 2004, after an incident in which he tried to choke Adriana in Nancy's bedroom, when Nancy was nine years old. Nancy testified that she heard her mother make a noise in the bedroom, went to her room, saw defendant on top of Adriana, and began crying. Defendant immediately got off of Adriana and told Nancy to calm down and that nothing was happening. Adriana told

---

[2] The piece of material was so small it was entirely consumed in the DNA analysis, and could not be tested to see if it was in fact skin.

[3] Defendant is right-handed.

Nancy to call the police. By the time the police arrived, defendant had already left. There were red marks and bruising on both sides of Adriana's neck.

Monica Sanchez had known Adriana since about 2004. Adriana and Nancy attended the church where Arturo and Monica Sanchez were pastors, and they lived with the Sanchezes for about five months in 2004. Adriana returned to live with defendant for a few months, and then defendant moved out of the house.

On one occasion in 2007, Monica Sanchez went to Adriana's house because Adriana was upset. At the time, defendant and Adriana were going through a divorce. The telephone rang, and Adriana put it on speaker. Defendant was on the phone, and he told Adriana that he had failed the first time and he would not fail the next time. When defendant said that, Adriana began to cry.

Araceli Uribe, a colleague and friend of Adriana, testified that she lived with defendant and Adriana for a few months during 2003. On several occasions, she saw defendant grab Adriana aggressively by the waist and force her toward him. The first time this happened, defendant forced Adriana into their bedroom, as she yelled at him to leave her alone and tried to get away. Defendant told her that if she wasn't going to be his, then she would not be anyone else's. Adriana's pajamas were torn in the incident. On another occasion, he pulled her from the living room toward the bedroom asking her to have sex with him. Adriana appeared frightened.

Adriana decided to move to Los Angeles, and Uribe helped her. As they drove, defendant called Adriana, and she put the phone on speaker. Uribe heard defendant tell Adriana to return home because he was going to take his life and she would be to blame. A few minutes later defendant called back and told her, "You are gonna pay for it, and if you are not gonna be mine, you are not gonna be anybody else's." He also told her, "I'm gonna kill you. Come back. Otherwise I'm gonna kill you." At some point in 2003, Adriana returned to the home she shared with defendant.

Defendant moved out of the family home in Suisun in 2004. Uribe changed the lock to the front door. Once, Uribe saw defendant use a screwdriver to get in through the sliding glass door in back.

4

On one occasion when Uribe was visiting Adriana, defendant came to the house when Adriana was outside. Defendant argued with Adriana about the house, using a loud voice and telling her not to take the house from him. He grabbed her by the shoulder when she tried to walk to the house.

About a month before the killing, defendant waited for Adriana in the parking lot after work, and Uribe heard him tell Adriana that "if she wasn't gonna be for him she wasn't gonna be for anybody else."[4]

A relative of defendant testified that defendant had told him two or three times in 2007 that if he lost the house during the divorce, he would kill Adriana. Defendant also told him, "She will not humiliate me. She will not laugh at me. I will kill her." Defendant told the relative in 2006 or 2007 that he had tried to kill Adriana by choking her, but that he was unsuccessful because their daughter called the police, and that this time he would "make sure to." The relative did not take the statements seriously and did not call the police.

### D. The Defense

The defense theory was that someone else, Martin Alvarez, killed Adriana. Alvarez knew Adriana through church and had a strong affection for her.

Nine days after Adriana's body was found, Alvarez was arrested in Napa for public intoxication. He appeared extremely intoxicated, had slurred speech, and seemed confused. While he was being booked, Alvarez put his head down and began weeping. The arresting officer, Jack Thomson, testified that he asked Alvarez what was wrong, and Alvarez pointed at his heart and replied, "I killed her" and "I killed my girlfriend." He said he had done so in Fairfield eight days previously. Alvarez spoke very little English, and a Spanish-speaking correctional officer, Carlos Quintana, came to translate for Thomson. Thomson and Quintana testified to inconsistent accounts of the ensuing conversation. Thomson testified that Alvarez told Quintana he had killed his girlfriend, and identified her as Adriana Ortiz or Adriana Pantoja. However, Quintana testified that

---

[4] Uribe later testified this incident might have taken place in 2005.

5

when he asked Alvarez why he was upset, Alvarez said his girlfriend had just been killed and that was why he was out drinking. He did not say he had killed her and did not identify her by name. The entire conversation with defendant took place in Spanish.

The Napa Police Department contacted the Suisun Police Department, and officer Eric Vera went to interview Alvarez. Alvarez told Vera he did not kill Adriana. Three months later, Alvarez spoke with Vera again and told him he had a "crush" on Adriana. He said he did not go to her funeral because he had been depressed.

Alvarez testified that he did not recall having said he killed Adriana. He remembered telling another officer the next day that he had not killed her. He denied having had a dating relationship with Adriana. He said he did not go to her funeral because he was working and he had not been invited. He testified that he did not kill Adriana.

Defendant also presented evidence that Adriana had driven defendant's truck in the past, that a stain on the truck's steering wheel tested negative for blood, and that fingerprints found in the house did not match defendant's.

## E. Verdict and Sentence

The jury found defendant guilty of first degree murder (Pen. Code, § 187, subd. (a))[5] and found true an allegation that he personally used a deadly and dangerous weapon in the commission of the offense (§ 12022, subd. (b)(1)). The trial court sentenced him to a prison term of 25 years to life for murder and imposed a one-year enhancement for the use of the deadly and dangerous weapon.

## II. DISCUSSION

### A. Motion to Suppress Evidence

#### 1. Background

Before trial, defendant moved to suppress evidence of the bloodstain in his truck on the ground that its discovery was the result of an unlawful detention. According to the motion, he was subjected to an unlawful detention, his consent to the search of the truck

---

[5] All statutory references are to the Penal Code.

6

was invalid, and he was arrested and subjected to DNA testing without probable cause. At the hearing on the motion, Sylvia Martinez, an investigator with the district attorney's office, and Detective William Lee testified about how the bloodstain was found.

When Lee arrived at the scene of the killing, Nancy told him that defendant and Adriana fought a lot and that defendant had made death threats toward Adriana.

Later that day, Martinez and several detectives and officers arrived at defendant's home. Lee was in uniform, as was at least one other officer. Defendant was not home, so they called the cell phone number Nancy had given them, identified themselves, and asked him if he would come meet them at the home. Defendant arrived a few minutes later, parked his truck, and approached them without being directed. They noticed two red marks on his left cheek, approximately two inches long, as if the skin had been scratched. The scratches appeared to have ointment on them. The officers also noticed defendant had cuts on his left hand and a Band-Aid on one of his fingers.

Martinez explained to defendant that the officers wanted to talk with him about what was going on with his wife. At Lee's direction, she also asked defendant what had happened to his face.[6] Defendant said that a few days previously he had been confronted by a man who asked for money and assaulted him. Lee reached for defendant's hand, held it and looked at it, and asked him about the Band-Aid.[7] Defendant did not try to pull his hand away or hide it from Lee.

Martinez asked defendant whether the officers could search the truck. Defendant said that would be fine, and then said a second time, without being asked again, that he had no problem and that the search was fine. He got his keys and unlocked the truck, and

---

[6] Martinez was fluent in Spanish, and defendant was more comfortable speaking Spanish than English.

[7] Lee described the injuries as sharp wounds or cut marks to the sides and top of defendant's hand, and as "linear cut marks, laterally across his fingers." Photographs taken after defendant was arrested show red marks at the top of the index and middle fingers of his left hand, what appear to be slight markings across the knuckles of the same hand, and a scrape on the underside of his left hand, just below his smallest finger.

Lee looked inside and saw the stain on the seat cushion that was later found to contain Adriana's blood.

The entire conversation took four to six minutes. During the conversation, defendant was never told he was not free to leave and was not handcuffed.

Martinez asked defendant if he was willing to come to the police department and speak with the officers, and he said yes. Defendant was taken to the Sheriff's Department in one of the officers' cars. He was not placed in handcuffs either on the ride there or at the interview room. He was not told explicitly that he did not have to go with the officers. When the interview began, defendant was told multiple times that he was free to leave any time he wanted.

At the end of the interview, defendant was arrested. The arrest was based on Lee's observations of defendant's injuries, the truck, the fact that there were no signs of forced entry or disturbance other than the living room and bathroom at Adriana's house, and discrepancies in defendant's statements during the interview.

Martinez testified that when the group went to defendant's home, he was the focus of the investigation and they wanted to "speak to him and try to see if he was a suspect."

The trial court denied the motion to suppress. It found the defendant acted voluntarily both in returning to his home and in accompanying the officers to the police station. The court also found that Lee's action in taking defendant's hand to see it better did not constitute coercive behavior and that defendant remained free throughout the process to tell the officers he did not want to talk with them, allow them to look in his vehicle, or go to the police station.

*2. Discussion*

Defendant contends that by the time Lee obtained defendant's permission to search the truck, the encounter had become an unlawful detention, and his consent to the warrantless search was therefore invalid. "The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under

8

the Fourth Amendment, we exercise our independent judgment. [Citations.]" (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

"Police contacts with individuals may be placed into three broad categories ranging from the least to the most intrusive: consensual encounters that result in no restraint of liberty whatsoever; detentions, which are seizures of an individual that are strictly limited in duration, scope, and purpose; and formal arrests or comparable restraints on an individual's liberty. [Citations.] . . . Unlike detentions, [consensual encounters] require no articulable suspicion that the person has committed or is about to commit a crime. [Citation.]" (*In re Manuel G.* (1997) 16 Cal.4th 805, 821; see also *People v. Terrell* (1999) 69 Cal.App.4th 1246, 1253.) "[A] detention does not occur when a police officer merely approaches an individual on the street and asks a few questions. [Citation.] As long as a reasonable person would feel free to disregard the police and go about his or her business, the encounter is consensual and no reasonable suspicion is required on the part of the officer. Only when the officer, by means of physical force or show of authority, in some manner restrains the individual's liberty, does a seizure occur. [Citations.] '[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.' [Citation.] This test assesses the coercive effect of police conduct as a whole, rather than emphasizing particular details of that conduct in isolation. [Citation.] Circumstances establishing a seizure might include any of the following: the presence of several officers, an officer's display of a weapon, some physical touching of the person, or the use of language or of a tone of voice indicating that compliance with the officer's request might be compelled. [Citations.]" (*In re Manuel G.*, *supra*, 16 Cal.4th at p. 821.)

Defendant makes a two-part argument. First, he contends that by taking his hand to examine it, Lee restrained his freedom to leave and thereby transformed the encounter from a consensual one to a detention, and that Lee lacked a reasonable suspicion to

justify a detention. For this point, defendant relies on *Caifornia v. Hodari D.* (1991) 499 U.S. 621, 625, which indicates a seizure or arrest may take place by "the slightest application of physical force," and *People v. Castaneda* (1995) 35 Cal.App.4th 1222, 1227, which states, "[u]ntil the officer asserts some restraint on the contact's freedom to move, no detention occurs." Second, defendant argues, the unlawfulness of the detention tainted his subsequent consent to the search of the truck and rendered it nonvoluntary, and the evidence discovered in the search was therefore inadmissible. (*People v. Stier* (2008) 168 Cal.App.4th 21, 28; *People v. Saldana* (2002) 101 Cal.App.4th 170, 176; see also *United States v. Washington* (9th Cir. 2004) 387 F.3d 1060, 1072 [" ' "evidence obtained subsequent to an illegal investigation is tainted by the illegality and thus inadmissible, notwithstanding . . . consent, unless subsequent events have purged the taint." ' "].)

We need not decide whether the encounter had become a detention because we conclude that, even assuming it was a detention, the detention was lawful. "Temporary detentions for questioning or investigation may be justified by circumstances falling short of probable cause. [Citation.] In order to justify such a detention, ' "the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity. Not only must he subjectively entertain such a suspicion, but it must be objectively reasonable for him to do so: the facts must be such as would cause any reasonable police officer in a like position, drawing when appropriate on his training and experience [citation], to suspect the same criminal activity and the same involvement by the person in question." ' [Citation.]" (*In re J.G.* (2010) 188 Cal.App.4th 1501, 1506.) Thus, " ' "an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith. [Citation.]" ' " (*People v. Pitts* (2004) 117 Cal.App.4th 881, 885.)

The facts in this case easily meet the standards for a permissible detention. The officers knew Adriana had been found dead, with her throat slit. The area of the house

where she was killed was in some disarray, but there were no signs of forced entry or any other crime having taken place there. Nancy had told officers the couple fought a lot and defendant had made death threats against Adriana. Defendant had fresh scratch marks on his face and injuries on his hand. These facts support more than a mere "hunch" that criminal activity had taken place and that defendant was involved in it. (*See People v. Pitts*, *supra*, 117 Cal.App.4th at p. 885.)

We are not persuaded otherwise by defendant's argument that the information Nancy provided about the death threats was stale (see *People v. Hirata* (2009) 175 Cal.App.4th 1499, 1504 [information supporting warrant was stale where there was 82-day delay between drug transaction and issuance of warrant]) or that defendant gave an innocent explanation for his facial scratches (see *In re Tony C.* (1978) 21 Cal.3d 888, 894 [detention not permissible where circumstances not reasonably consistent with criminal activity]). The facts of which the officers were aware showed that Nancy had recently been killed, that defendant had made death threats, and that he had suffered injuries that were consistent with being scratched. As noted in *In re Tony C.*, "[t]he possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct." (*Id.* at p. 894.) Assuming defendant was detained when Lee took his hand, the detention was justified.

Because we conclude there was no unlawful detention, we reject defendant's argument that his consent to the search of the truck was tainted by the unlawfulness. The trial court properly denied the suppression motion.

## B. Refusal of Third Party Culpability Instruction

Defendant requested the jury be instructed as follows on third party culpability: "You have heard evidence that a person other than the defendant committed the offense with which the defendant is charged. The defendant is not required to prove the other person's guilt. It is the prosecution that has the burden of proving the defendant guilty beyond a reasonable doubt. Therefore, the defendant is entitled to an acquittal if you have a reasonable doubt as to the defendant's guilt. Evidence that another person committed the charged offense may by itself leave you with a reasonable doubt. [¶] If

11

after considering all the evidence, including evidence that another person committed the offense, you have a reasonable doubt that the defendant committed the offense, you must find the defendant not guilty." The trial court denied the request, concluding that even without the requested instruction, the jury would be adequately instructed on all the issues raised in the instruction. Defendant contends the trial court erred prejudicially in denying his request that the jury be given the instruction pinpointing his theory of the case, that is, that Martin Alvarez killed Adriana. (See *People v. Ward* (2005) 36 Cal.4th 186, 214–215 [trial court must give pinpoint instruction on defendant's theory of case upon request, if supported by substantial evidence].)

Our Supreme Court rejected a similar contention in *People v. Hartsch* (2010) 49 Cal.4th 472, 504 (*Hartsch*). The trial court there had refused to give two proposed instructions regarding third party liability. The first proposed instruction stated in pertinent part: " 'If the evidence presented in this case convinces you beyond a reasonable doubt that the defendant is guilty, you should so find, even though you may believe that one or more other persons are also guilty. [¶] On the other hand, if you entertain a reasonable doubt of the defendant's guilt after an impartial consideration of the evidence presented in the case, including any evidence of the guilt of another person or persons, it is your duty to find the defendant not guilty.' " (*Ibid*.) The second proposed instruction stated, " 'Evidence has been presented during the course of this trial indicating or tending to prove that someone other than the defendant committed, or may have had a motive and opportunity to commit the offense(s) charged. In this regard, it is not required that defendant prove this fact beyond a reasonable doubt. [¶] The weight and significance of such evidence are matters for your determination. If after consideration of all of the evidence presented, you have a reasonable doubt that the defendant committed the offense(s) charged, you must give the defendant the benefit of the doubt and find him not guilty.' " (*Ibid*.)

The court in *Hartsch* rejected the defendant's argument that the trial court erred in refusing the proffered instructions. The court began its analysis, "[w]e have noted that similar instructions add little to the standard instruction on reasonable doubt. [Citation.]

12

We have also held that even if such instructions properly pinpoint the theory of third party liability, their omission is not prejudicial because the reasonable doubt instructions give defendant ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof. [Citations.]" (*Hartsch*, *supra*, 49 Cal.4th at p. 504.) The court went on to note that the first proposed instruction did little more than restate the reasonable doubt standard, and that "[t]he omission of this instruction, if error, could not have affected the verdict. It is hardly a difficult concept for the jury to grasp that acquittal is required if there is reasonable doubt as to whether someone else committed the charged offenses." (*Ibid.*) The court then concluded the second proposed instruction was improper because it was unduly argumentative. (*Ibid.*)

Our Supreme Court reached a similar conclusion in *People v. Earp* (1999) 20 Cal.4th 826, 887 (*Earp*). There, the defendant offered a pinpoint instruction that " '[e]vidence has been offered that a third party is the perpetrator of the charged offense. It is not required that the defendant prove this fact beyond a reasonable doubt. In order to be entitled to a verdict of acquittal, it is only required that such evidence raise a reasonable doubt in your minds of the defendant's guilt.' " The high court ruled that the defendant suffered no prejudice from the trial court's refusal to give the instruction: the jury was instructed that the prosecution had to prove the defendant's guilt beyond a reasonable doubt, and the jury knew from defense counsel's argument that it was the defense theory that someone else had committed the crimes charged. (*Ibid.*)

Here, the jury received the standard instructions on the presumption of innocence, the burden of the prosecution to prove defendant guilty beyond a reasonable doubt, and the jury's duty to consider all the evidence presented at trial. Defense counsel had the opportunity to emphasize the evidence of Alvarez's guilt in his closing argument, and he did so. He also pointed out to the jury that the prosecution had the duty to prove defendant's guilt beyond a reasonable doubt and that defendant had no burden at all. Like the courts in *Hartsch* and *Earp*, we conclude the requested instruction added little to the standard instructions and that defendant suffered no prejudice by their omission.

13

Defendant argues, however, that he was prejudiced by the trial court's failure to give the requested instruction because the prosecutor "exploited" the lack of the instruction by arguing to the jury, "In order for you to believe that Martin Alvarez committed this crime you have to believe that then there was some type of a conspiracy against Mr. Pantoja" and that if Alvarez had committed the crime, he would have been covered in blood. This argument, however, was simply the prosecutor's theory of the defense's case; it did not misinform the jury about the burden of proof. Accordingly, we reject defendant's contention that the trial court prejudicially erred by refusing defendant's proposed instruction on third party culpability.

## C. Sufficiency of the Evidence

Defendant contends there was no substantial evidence to support a finding either that he killed Adriana or that he acted with premeditation and deliberation. Our standard of review in evaluating such a claim is well settled. "In reviewing a claim for sufficiency of the evidence, we must determine whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or special circumstance beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638–639 (*Jennings*.)

Applying these standards, we conclude the evidence is sufficient to support a finding that defendant killed Adriana. Evidence of prior threats may serve as proof of the identity of an offender. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 668 (*San*

14

*Nicolas*).) The evidence at trial showed that defendant made one attempt on Adriana's life in 2004; that he subsequently threatened multiple times to kill her; that some of those threats were made in 2007, as the couple was going through their divorce; that when making one of those threats, defendant told a relative he would kill Adriana if he lost the house during the divorce; and that Adriana in fact was awarded the house in the divorce proceedings. After Adriana was killed, fresh scratch marks were observed on defendant's face as well as injuries on his hands. Finally, DNA that matched defendant's to a near certainty was found under one of Adriana's fingernails.

Defendant points out that the fragment of material that contained his DNA was small and was not tested to determine whether it was skin; he argues that the DNA might have been transferred from one sample to another before or during DNA testing. The jury heard the testimony of the criminalists who collected and analyzed the sample, and we see no basis to conclude the evidence is insufficient to support a conclusion that defendant's DNA was in fact found under Adriana's fingernail. This DNA, in conjunction with defendant's fresh injuries, in turn supports a conclusion that Adriana scratched defendant during the course of the attack on her life. Defendant also points out that there was no evidence of how long Adriana's blood had been in his truck, that Adriana had driven his truck in the past, and that there was no other physical evidence that he killed her. These facts, however, do not undermine the conclusion that substantial evidence supports the jury's finding that defendant killed Adriana.

We likewise reject defendant's contention that there is insufficient evidence that the murder was in the first degree. Section 189 provides that a murder perpetrated by specified means "or by any other kind of willful, deliberate, and premeditated killing" is murder of the first degree. " 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' [Citation.] In this context, ' "premeditated" means "considered beforehand" and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' [Citation.] We normally consider three kinds of evidence to determine

15

whether a finding of premeditation and deliberation is adequately supported—preexisting motive, planning activity, and manner of killing—but '[t]hese factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation.' [Citation.]" (*Jennings*, *supra*, 50 Cal.4th at p. 645.) These factors, which are described in *People v. Anderson* (1968) 70 Cal.2d 15, 26–27, are intended to "aid reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse," but "[do] not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125, citing *Anderson*, *supra*, 70 Cal.2d at p. 27.) Moreover, "premeditation can occur in a brief period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' " (*Perez*, *supra*, 2 Cal.4th at p. 1127.)

The evidence here is sufficient to sustain the jury's finding. Defendant's prior threats to kill Adriana, some made in connection with the divorce, as well as his earlier attempt on her life, support the conclusion that his intent to kill her was not the result of a rash impulse. (See *San Nicolas*, *supra*, 34 Cal.4th at p. 668 [evidence of prior threats admissible to show defendant's state of mind].) There is evidence of preexisting motive: defendant's statements show that he believed Adriana was humiliating him and said he would kill her if he lost the house in the divorce—as in fact he did. Finally, the manner of the killing itself—in which the knife was repositioned several times as Adriana's throat was cut—and the killer's success in leaving few traces, provide some evidence of planning and deliberation. This evidence is sufficient to support the jury's finding.

### III.    DISPOSITION

The judgment is affirmed.

16

_____
Rivera, J.

We concur:


_____
Ruvolo, P.J.


_____
Reardon, J.